STATE ex rel., MISSOURI GAS ENER-GY, A Division of Southern Union Company; Appellant–Respondent,

State ex rel., Office of the Public Counsel, Respondent,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent–Appellant.

Nos. WD 65366, WD 65469.

Missouri Court of Appeals, Western District.

Dec. 27, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 2006.

Application for Transfer Denied April 11, 2006.

James C. Swearengen, Jefferson City, MO, for appellant-respondent.

Douglas E. Micheel, Jefferson City, MO, for respondent.

Robert V. Franson, Jefferson City, MO, for respondent-appellant.

Before EDWIN H. SMITH, C.J., THOMAS H. NEWTON, and LISA WHITE HARDWICK, JJ.

THOMAS H. NEWTON, Judge.

Missouri Gas Energy (MGE), claiming among other matters that it had been unable to earn its Commission-authorized rate of return under prior tariffs and could not therefore compete effectively in capital markets, sought a $44.8 million increase in the rates it charges its Missouri customers for natural gas service. After extensive hearings, the Public Service Commission (Commission) entered an order that gave the public utility a $22.5 million rate increase. The key issue on appeal is whether the Commission's decision results in a confiscatory and unreasonable return on equity. The Cole County Circuit Court found that the Commission's order was unlawful and unreasonable and remanded the case for further proceedings. We disagree and hereby affirm the Commission's order.

### FACTUAL AND PROCEDURAL BACKGROUND

MGE distributes natural gas in Missouri as an operating division of Southern Union Company (Southern Union). It has no separate corporate existence; thus, MGE has no capital structure of its own, and it has no investors in its own right. Southern Union, which owns gas-distribution companies like MGE in a number of states, was characterized during Commission proceedings as a company with an aggressive growth strategy that has for some years operated under a capital structure which includes significantly more debt than equity. Unlike many publicly-traded companies, Southern Union does not pay dividends to its investors. Panhandle Eastern Pipeline Company (Panhandle) is an interstate pipeline company that is a separate Southern Union subsidiary. In 2003 the Commission approved a Stipulation and Agreement relating to Southern Union's Panhandle acquisition. Under the terms of that agreement, Panhandle's debt is

non-recourse as to MGE and Southern Union, i.e., MGE and its customers are supposed to be insulated financially in all respects from Panhandle debt.[1]

In November 2003, MGE filed tariff sheets with the Commission designed to implement a general rate increase of 9.8%, or $44,875,635. The Commission suspended the tariff until October 2, 2004, and granted a number of petitions to intervene. In December 2003, the Commission established the test year as the 12–month period ending June 30, 2003, updated for known and measurable changes through December 31. A further true-up period through April 30, 2004, to update certain cost components, was established by the Commission in June 2004. Four local public hearings were held on the proposed tariffs, and evidentiary hearings were held in late June and early July 2004. A true-up hearing took place thereafter, and the Commission, voting 3–2, issued its Report and Order on October 1. Both MGE and the Office of Public Counsel filed applications for rehearing, which were denied, and both filed petitions for writ of review with the Cole County Circuit Court.

The circuit court determined that the Commission's authorization of a return on equity of 10.5% was arbitrary, capricious, and unlawful, and not based on competent or substantial evidence. While the court found all of the expert witnesses to be at least minimally qualified, it expressed its concern about the credibility of testimony on which the Commission relied. In this regard, the circuit court stated that when the Commission referred in its Report and Order to "whatever *other* credibility questions may be raised against the positions offered by Staff and Public Counsel," it was recognizing "shortcomings in the testimony and recommendations" of these witnesses. (emphasis in original) The court

further found that imposing a return on equity below the 11.1% national average, "coupled with the imposition of a 'more risky' 29.99% equity-based capital structure" was unlawful, unreasonable, arbitrary, capricious, and not based on competent or substantial evidence. This appeal followed.

MGE claims on appeal that the Commission's decisions as to capital structure and return on equity result in a rate of return that is unconstitutionally confiscatory, unreasonable, arbitrary, and capricious, and not supported by the evidence. MGE further contends that the Commission erred in including the Panhandle debt in MGE's capital structure, thus lowering its equity ratio. MGE also challenges the qualifications of the expert witnesses for Commission Staff and the Office of Public Counsel on whom the Commission relied in making its determination. Finally, MGE claims that the Commission's return-on-equity determination was based on unwarranted speculation and not on competent and substantial evidence, and that the Commission's inadequate adjustment to MGE's return on equity to account for the increased risk of its capital structure was not based on competent and substantial evidence.

## STANDARD OF REVIEW

In an administrative appeal, we review the agency's findings and decisions and not the circuit court's judgment. *Friendship Vill. of S. County v. Pub. Serv. Comm'n of Mo.*, 907 S.W.2d 339, 344 (Mo. App. W.D.1995). Our standard of review consists of two parts as we determine first, whether the Commission's order is lawful, and second, whether the order is reasonable and based on competent and substantial evidence upon the whole record. *Id.* We presume that the Commission order is

1. According to testimony before the Commis- sion, this debt is on the order of $1.2 billion.

valid; the burden of proving its invalidity is on those attacking it. *Id.*

In determining whether a Commission order is lawful, we "exercise unrestricted, independent judgment and correct any erroneous interpretations of law." *Id.* We also assess "whether the Commission had the statutory authority to act as it did." *Id.* As to an order's reasonableness, we determine whether (i) the order is supported by substantial and competent evidence on the whole record, (ii) the decision is arbitrary, capricious or unreasonable, or (iii) the Commission abused its discretion. *Id.* at 344–45. We also consider the evidence in the light most favorable to the Commission along with all reasonable supporting inferences and defer to the Commission if the evidence permits either of two opposite findings. *Id.* at 345. In other words, we do not weigh the evidence. *State ex rel. Assoc. Nat. Gas Co. v. Pub. Serv. Comm'n,* 706 S.W.2d 870, 874 (Mo. App. W.D.1985). It is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside. *Friendship Vill,* 907 S.W.2d at 345. And where a decision rests on the exercise of regulatory discretion, we will not substitute our judgment for that of the Commission, particularly on issues within its area of expertise. *Id.*

To the extent that a party challenges the adequacy of the Commission's findings of fact, the standard we apply is whether the findings of fact are "sufficiently definite and certain under the circumstances of the particular case to enable the court of review to review the decision intelligently and ascertain if the

facts afford a reasonable basis for the order without resorting to the evidence." *AT & T Commc'ns of Sw., Inc. v. Pub. Serv. Comm'n,* 62 S.W.3d 545, 548 (Mo. App. W.D.2001) (emphasis, internal quotations and citation omitted). It is not, however, "required for the validity of administrative findings that [the Commission] go into evidentiary detail." *State ex rel. Assoc. Nat. Gas Co. v. Pub. Serv. Comm'n,* 37 S.W.3d 287, 295 (Mo.App. W.D.2000) (internal quotations and citation omitted). Rather, we must be able to determine the facts on which the order was based from the Commission's Report and Order. *Id.*

The qualification of a witness as an expert rests within the factfinder's discretion. *Emerson Elec. Co. v. Crawford & Co.,* 963 S.W.2d 268, 271 (Mo.App. E.D. 1997). In determining whether a witness is an expert under section 490.065.1,[2] the factfinder looks to whether he or she possesses a "peculiar knowledge, wisdom or skill regarding the subject of inquiry, acquired by study, investigation, observation, practice, or experience." *Id.* (citation and internal quotations omitted).[3] Moreover, witness credibility is a matter for the factfinder, "which is free to believe none, part, or all of the testimony. We do not substitute our judgment for that of the [factfinder] on credibility issues." *Commerce Bank, N.A. v. Blasdel,* 141 S.W.3d 434, 456–57 n. 19 (Mo.App. W.D.2004) (citation and internal quotations omitted).

## LEGAL ANALYSIS

### Regulatory Finance—Capital Structure and Return on Equity

As we consider the issues raised by this appeal, it is helpful to keep

---

**2.** Unless otherwise indicated, all statutory references are to RSMo. (2000) and the Cumulative Supplement (2004).

**3.** In *State Board of Registration for Healing Arts v. McDonagh,* 123 S.W.3d 146, 154–55

(Mo. banc 2003), the Missouri Supreme Court ruled that the standards set out in section 490.065 apply to the admission of expert testimony in contested case administrative proceedings.

in mind that the cost of capital, or the amount a utility must pay to secure financing from debt and equity investors (shareholders), "is essentially the equivalent of fair rate of return." *Assoc. Nat. Gas Co.,* 706 S.W.2d at 875. And rate of return is determined by a calculation that factors in (i) the ratio of debt and equity to total capital, and (ii) the cost and (iii) weighted cost for each of these capital components. *Id.* While rate of return is the result of a straightforward mathematic calculation, the inputs, particularly regarding the cost of common equity, are not a matter of "precise science," because inferences must be made about the cost of equity, which involves an estimation of investor expectations. In other words, some amount of speculation is inherent in any ratemaking decision to the extent that it is based on capital structure, because such decisions are forward-looking and rely, in part, on the accuracy of financial and market forecasts.

A rate of return is generally considered to be fair if it "covers utility operating expenses, debt service, and dividends, if it compensates investors for the risks of investment, and if it is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *Assoc. Nat. Gas Co.,* 706 S.W.2d at 875 (citation and internal quotations omitted). That said, "[t]he rate of return should not be higher than is necessary to achieve these goals. Otherwise, utility customers will pay excessive prices, something regulation seeks to prohibit." *Id.* at 873. The United States Supreme Court tells us simply that "the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests." *Fed. Power Comm'n v. Hope Nat. Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (*Hope*). While MGE argues that it has been unable to earn its authorized rate of return and suggests that it therefore deserves higher rates, the law does not require that rates yield any particular return, *State ex rel. Capital City Water Co. v. Pub. Serv. Comm'n,* 298 Mo. 524, 252 S.W. 446, 456 (banc 1922), and past losses are not considered in deciding whether a new rate is confiscatory. *Id.* at 449.

According to the Commission, "all else being equal, a capital structure that includes a low percentage of equity and a large percentage of debt will be less costly, resulting in a lower rate of return, and consequently a lower revenue requirement and lower rates to customers." This is so because the cost of debt, or what it costs a corporation to borrow money and pay interest, is usually less than the cost of equity, i.e., issuing stock and paying dividends or a return on investment. *Assoc. Nat. Gas Co.,* 706 S.W.2d at 876.

A corollary to this principle is that "a company with a capital structure that includes a high percentage of debt is more risky for shareholders [who] will consequently demand a higher rate of return to compensate them for the increased risk caused by the high level of debt." This is so because the holders of equity are subordinate to the holders of debt and face the greater risk should the enterprise fail. The more equity there is in a company's capital structure, the higher the rate of return and the more attractive a company is as an investment, because a high rate of return imposes higher costs on customers, thus increasing a company's cash flow. There is, obviously, a limit to the costs that can be imposed on ratepayers, who may default when the cost is too high, a situation that also runs counter to investor interests.

*Lawfulness*

Section 393.150 gives the Commission the authority to conduct a hearing

regarding the propriety of new rates filed by any gas corporation and to make a decision regarding those rates. Section 393.150.2 places the burden of proving that an increased rate is just and reasonable on the public utility. And all charges made or demanded "shall be just and reasonable and not more than allowed by law." § 393.130.1. Section 393.270.4 requires the Commission to give due regard, in determining the price to be charged for gas, "to a reasonable average return upon capital actually expended," among other matters. The question of lawfulness—here, whether the Commission had the authority to rule on the propriety of MGE's tariffs—is clearly established by statute. Because the Commission has the statutory authority to rule on whether new tariffs are just and reasonable, the Commission's order was lawful in this regard. *Friendship Vill.*, 907 S.W.2d at 348.

In addition, because we have determined that the findings of fact and conclusions of law, as discussed more fully below, are sufficient for us to review the issues without having to resort to the evidence, the Commission's order is not unlawful on this ground. *AT & T Commc'ns of Sw., Inc.*, 62 S.W.3d at 548. Nor has the Commission erroneously interpreted the law in this proceeding, so we next consider the justness and reasonableness of the rates the Commission approved.[4]

### Justness and Reasonableness

In determining whether public-utility rates are just and reasonable, we are guided by the seminal United States Supreme Court decisions in *Hope* and *Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) (*Bluefield*). In *Bluefield* the Court established a standard for "just and reasonable" public-utility rates as follows:

What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.

262 U.S. at 692–93, 43 S.Ct. 675.

The Court refined this standard further in *Hope*, noting that public-utility commissions are "not bound to the use of any single formula or combination of formulae in determining rates," and that ratemaking "involves the making of 'pragmatic adjustments.'" 320 U.S. at 602, 64 S.Ct. 281

---

**4.** MGE appears to base its claims about the unlawfulness of the Commission's Report and Order on the rates themselves, the methods used to calculate the rates, and the weight and competence of the evidence supporting the Commission's decision. There is nothing in this appeal that challenges the Commission's interpretation of the law.

(citation omitted). According to the Supreme Court, under the "just and reasonable" standard "it is the result reached not the method employed which is controlling." *Id.* Further, "[i]t is not theory but the impact of the rate order which counts. *If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."* *Id.,* (emphasis added).

The capital structure that MGE recommended was characterized by the Commission and several witnesses as a "hypothetical" structure and was based on Southern Union's consolidated capital structure, excluding the Panhandle debt.[5] It contained an overall higher percentage of equity than debt. The recommended ratios of capital components to total capital were 47.49% for long-term debt, 11.49% for preferred stock and 41.14% for common equity. Such ratios are similar to the average ratios for comparable utilities, although the common equity ratio was somewhat lower than the average, and the debt was consequently somewhat higher. Factoring in the costs and weighted costs of these capital components, MGE proposed that the cost of capital/rate of return be calculated at 9.35%, and further recommended a return on equity of 12% for MGE's equity investors.

What MGE seeks is a capital structure with less debt, which would be more in line with national averages, but a higher return on equity—12%, as compared to the 2003 national average of 11.1%.[6] MGE justifies this increase in return on equity over the national average by pointing to the higher risk faced by investors due to the debt in its capital structure, which is somewhat higher than the national average even without inclusion of the Panhandle debt. While MGE argues that Panhandle debt must be excluded from consideration under the stipulation it signed in 2003, it is this debt that causes Southern Union's capital structure to significantly deviate from national averages and raises the risk of investing in the company.[7] Requiring ratepayers to pay an excessive risk premium effectively transfers the risk related to the company's acquisition from its shareholders to its ratepayers, something that the company agreed not to do via stipulation and agreement.[8] In this regard, the stipulation states:

Southern Union will not recommend an increase or claim Staff should make an adjustment to increase the cost of capital for MGE as a result of the Transaction. Any increases in cost of capital Southern Union seeks for MGE will be supported by documented proof: (1) that the increases are a result of factors not associated with the Transactions; (2) that the increases are not a result of

5. MGE claims that adoption of a hypothetical capital structure is *required* where the actual structure is outside the "zone of reasonableness," an issue we discuss more fully *infra.*

6. In 2002 the national average for comparable utilities was 11%.

7. In *Associated Natural Gas,* this court noted that wholly owned subsidiaries, like corporate divisions in our case, do not raise capital in the open market and, thus, that the attractiveness of a company as an investment "is de-

pendent on how attractive the parent company is as an investment." 706 S.W.2d at 877 (citation and internal quotations omitted).

8. MGE did not mention the Panhandle acquisition stipulation and agreement in its Application for Rehearing as a basis for excluding the Panhandle debt from its capital structure. Thus, any argument in its appeal to this court that relies on the purported legal consequences of that stipulation and agreement will not be considered further. § 386.500.2.

changes in business, market, economic or other conditions for MGE caused by the Transaction; or (3) that the increases are not a result of changes in the risk profile of MGE caused by the Transaction. Southern Union will ensure that the retail distribution rates for MGE ratepayers will not increase as a result of the Transaction.

And while the capital structure MGE recommended in this proceeding technically excludes the Panhandle "transaction," the risk on which it bases its inflated return-on-equity recommendation cannot be separated from the risk posed by actual market conditions, which reflect the Panhandle debt.

Staff and Public Counsel recommended that the Commission use Southern Union's actual consolidated capital structure, including the Panhandle debt, and differed only over whether short-term debt should also be included.[9] This can also be characterized as a hypothetical structure because, as noted above, MGE does not have its own capital structure.[10] Both recommendations contained a higher percentage of debt than equity. Thus, Staff's recommended ratios of capital components to total capital were 63.61% for long-term debt, 6.40% for preferred stock and 29.99% for common stock. Staff's expert witness further recommended a return on equity in the range of 8.52 to 9.52%. Public Counsel's recommendations as to long-term debt, short-term debt, preferred stock, and common stock were 59.77%, 5.80%, 6.06%,

and 28.37%, respectively. Public Counsel's expert witness recommended that MGE be allowed a return on equity of between 9.01 and 9.34%. The Commission adopted Staff's recommended capital structure, but increased the value for return on equity to 10.5%, which was the same return on equity adopted when MGE's rates were last approved in 2001.[11]

▮ In effect, the Commission increased Staff's recommended return on equity in recognition of the higher risk to shareholders from the large amount of debt in Southern Union's actual consolidated capital structure. The Commission was also concerned about costs to consumers, who will be facing significantly higher natural gas prices, which are passed directly through to them. So the Commission refused to adopt a return on equity as high as that suggested by MGE. Its decision to do so reflects a careful balance between consumer and shareholder interests (recall that high debt should mean lower rates for consumers and a high rate of return should mean higher rates and better returns for shareholders). And the Commission's decision is supported not only by the testimony of Public Counsel's and Staff's experts, but also by the testimony of one of MGE's expert witnesses, Dr. Roger A. Morin, who wrote the book on regulatory finance that many in the field apparently regard as the final word on the subject. He testified that he had recently estimated a return on equity for other public utilities

9. Southern Union had no short-term debt as of April 30, 2004, but because it had commonly used such debt in the past, Public Counsel's recommendation included a 13–month average short-term debt in its recommended capital structure.

10. The court in *Associated Natural Gas* observes that it is accepted regulatory practice to adopt a hypothetical capital structure for ratemaking purposes, particularly where it is

in the public interest to do so, i.e., when a utility's actual capital structure contains too much equity and not enough debt, thereby necessitating an inflated rate of return. 706 S.W.2d at 878. In our case, there is too much debt in MGE's capital structure.

11. The 2001 rate case was resolved by unanimous stipulation and agreement. Previous returns on equity approved by the Commission were 11.3% in 1996 and 10.93% in 1998.

that is in the 10.5% to 11.5% range. Dr. Morin also testified that it was inappropriate to impose a conservative equity-rich capital structure, which recognizes risk by increasing the equity cushion, *and* to adopt a return on equity that includes an added risk premium. According to Dr. Morin, this would constitute a double counting of the risk.

The Commission's decision was also based in part on testimony presented by a former commission employee who now makes investment decisions as to the billions of dollars held by a Missouri teachers' pension fund. The Public Counsel hired Mr. John Tuck to rebut MGE's challenge to the testimony of Public Counsel's expert witness. Commenting generally on Southern Union's capital structure, Mr. Tuck testified that the company's high debt level was the result of explicit management decisions to maximize investors' wealth, noting, "It does result in extra risks for the company, but if shareholders don't like that, they can sell their shares. Ratepayers, on the other hand, are captive customers." According to Mr. Tuck, investors do not look at capital structures used by regulatory authorities when making investment decisions; investment concerns are instead driven by what the rates ultimately do to a company's revenue stream. Mr. Tuck also observed that gas-distribution utilities tend to be less risky than the stock market as a whole because they have a more stable revenue stream. He indicated that he looks for a 9% return for longer-term investments.

Thus, the return on equity approved by the Commission that increases MGE's revenue stream by more than $22 million a year, while higher than that recommended by Staff or the Office of Public Council and lower than that recommended by MGE, is supported by substantial and competent evidence on the whole record. *Friendship Vill.*, 907 S.W.2d at 344. Just because MGE presented evidence contrary to the evidence on which the Commission relied is not enough, under our standard of review, for us to reverse its decision. *Id.* at 345. In addition, while the Commission did not consider all of the evidence presented by Staff and Public Counsel to be entirely credible, it is "free to believe none, part, or all of the testimony," and we do not substitute our judgment for that of the factfinder on credibility issues. *Commerce Bank, N.A.*, 141 S.W.3d at 456–57 n. 19.

■ Nevertheless, MGE claims in its first point that a below average return on equity (10.5%) and a significantly below average equity ratio (29.9%) combine to yield a rate of return that is confiscatory, arbitrary, capricious, and unreasonable. The *only* evidence that MGE relies on to support its argument is that the industry's average equity ratio ranges from 46.6 to 49.75% and the industry's average return on equity is 11.1%. Alone, this evidence does not demonstrate that the Commission's decision is confiscatory, because each rate case must be determined on its own facts. *See State ex rel. Mo. Water Co. v. Pub. Serv. Comm'n*, 308 S.W.2d 704, 718 (Mo.1957). The Commission considered the industry average, acknowledging that it can be a good indicator of the capital market in which Southern Union competes, but also observed that it would not be appropriate to "unthinkingly mirror the national average," because "if all commissions took that approach returns on equity would never change, despite changing economic facts, leading to unjust results." [12] Clearly, the Commission appropriately considered the national average as a factor

---

**12.** We would also note that averages are just that, averages. This means that returns for other gas-distribution companies are both lower and higher than the average.

in its decision, and nothing in *Hope* or *Bluefield* requires that it be bound by the national average.[13] In fact, as noted above, the Court in *Bluefield* specifically recognized that a public utility "has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures." 262 U.S. at 692–93, 43 S.Ct. 675. Southern Union has a risky capital structure by choice, and it is not entitled to the types of profits anticipated by speculative ventures. As well, the Commission's decision not to bind itself to the decisions of other regulatory commissions is supported by Mr. Tuck, who testified that doing so would not reflect what current capital costs are and would not reflect all of the circumstances specific to the individual case.

Moreover, like the public utility in *Associated Natural Gas,* MGE's confiscation argument is unsupported by the evidence and is simply a recitation of MGE's conclusion. 706 S.W.2d at 882. There is no basis in the record for us to determine that the Commission's order will result in a confiscation "or that no new purchasers of the utility's common stock will come forward." *Id.* In fact, despite MGE's performance (consistently earning less than its Commission-authorized rate of return) and what MGE argues are less than optimal returns, Southern Union recently sold 11 million shares of common equity and announced a public offering of common stock, arguably a reflection of its ability to compete effectively in capital markets.

MGE also argues, without stating where this evidence appears in the record, that even if the Commission had adopted the alternative equity ratio of 37.60% recommended by the Office of Public Counsel, MGE could earn approximately $2 million more each year.[14] Accordingly, MGE has not established that MGE's rate of return is confiscatory, arbitrary, capricious, and unreasonable.

*Methodology*

In challenging the Commission's attribution of Pandhandle's debt to MGE's capital structure, MGE is essentially challenging the method that the Commission used to reach its decision. Because we have already determined that the total effect of the order was just and reasonable, we do not need to consider how the Commission arrived at that order and rate. *Hope,* 320 U.S. at 602, 64 S.Ct. 281. We will do so, however, in light of the significance the issue ultimately has to our determination about the Commission order's justness and reasonableness.

Specifically, MGE challenges the attribution of Panhandle debt to its capital structure in three respects: (i) a Commission failure to make the factual findings necessary to support its decision; (ii) an inconsistent inclusion of the debt on MGE's balance sheet to determine its equity ratio and exclusion of the debt in calculating MGE's cost of long-term debt; and (iii) an unreasonable deviation from Commission precedent, which purportedly requires the use of a hypothetical capital

---

**13.** There is some evidence that the source for the industry average that MGE relies on was outdated and reflected return-on-equity decisions that could have been more than ten years old. According to dissenting commissioner Gaw, a 2004 decision by a public-utility regulator in New Jersey adopted a 10% return on equity for a Southern Union proxy, which "decision better reflects the current economic conditions faced by Southern Union

and highlights the reasonableness of Staff's return on equity calculation."

**14.** The parties have not provided this court with a dollar value for MGE's total capital; thus, it is quite frankly impossible for us to determine whether increasing MGE's equity ratio from 29.9% to 37.60% will actually provide MGE with $2 million more per year.

structure when the actual structure is beyond "the zone of reasonableness."

■ The Commission made specific findings to support its decision to attribute the Panhandle debt to MGE's capital structure and referred to specific testimony to support those findings. In this regard, the Commission stated:

MGE contends that the use of the consolidated capital structure adjusted to remove the effects of the Panhandle Eastern Pipeline subsidiary is appropriate because that structure most closely approximates the capital structure of Southern Union's natural gas distribution operations, including its MGE division. It does this by removing the equity and debt of the Panhandle Eastern subsidiary from the consolidated capital structure in a manner that it contends is consistent with the requirements of Generally Accepted Accounting Principles (GAAP).

Although Southern Union describes its proposed capital structure as an adjusted actual consolidated capital structure, what it is proposing may ·more accurately be described as a hypothetical capital structure in that its proposed capital structure clearly does not exist in the real world. Rather, it is the unadjusted consolidated capital structure under which Southern Union actually operates in the marketplace. Southern Union is able to conduct business, finance its operations, and raise capital with an investment grade rating based on that capital structure. When a business analyst such as Moody's or Standard & Poor's examines Southern Union to assess its credit worthiness, it looks to that unadjusted consolidated capital structure to make its determination. [footnote omitted]

Furthermore, Southern Union's unadjusted consolidated capital structure, with its heavy reliance on debt, results directly from Southern Union's management decision to become highly leveraged to finance the purchase of Panhandle Eastern, as well as earlier acquisitions. Southern Union decided to take on that additional debt because it saw an opportunity to earn greater returns to the benefit of its shareholders. That decision is clearly within Southern Union's management prerogative and the Commission does not wish to criticize or punish Southern Union for that decision. However, Southern Union must operate with the results of its investment decisions and one result of those investment decisions is a capital structure that includes a large amount of debt and relatively low amounts of equity.

These findings, based on evidence in the record, may not be to MGE's liking, but they constitute a sufficient factual basis for the Commission's decision to include the Panhandle debt in MGE's capital structure.

■ We will not consider any error that MGE bases on a purported inconsistency in the way Panhandle debt is treated by the Commission, because that issue was not raised in MGE's Application for Rehearing. § 386.500.2 (applicant for rehearing "shall not in any court urge or rely on any ground not so set forth in its application for rehearing."); *Friendship Vill.*, 907 S.W.2d at 346–47 (failure to specifically raise issue in application for rehearing bars such a challenge to Commission order on appeal).

■ Regarding MGE's assertion that the Commission erred by unreasonably deviating from a previous ruling as to the use of a hypothetical capital structure where an actual structure is beyond the zone of reasonableness, the only authority

MGE cites is an American Law Reports annotation. In *State ex rel. Churchill Truck Lines, Inc. v. Public Service Commission*, 734 S.W.2d 586, 593 (Mo.App. W.D.1987), this court set forth as well settled the principle that the Commission is not bound by *stare decisis. See also State ex rel. GTE N. v. Pub. Serv. Comm'n*, 835 S.W.2d 356, 371 (Mo.App. W.D.1992) (inconsistencies between current and prior decisions are of no concern, "so long as the action taken is not otherwise arbitrary or unreasonable."). According to MGE, the Commission's departure from the rule enunciated in a 1993 decision is arbitrary and unreasonable because it favors one constituency, ratepayers, over another, public utilities.

The case to which MGE refers, *In re St. Joseph Light & Power*, 2 Mo.P.S.C.3d 248 (1993), involved a public utility that had a high amount of equity and a low amount of debt in its capital structure, the opposite of what we are considering herein. The Commission decided to protect ratepayers in that case by establishing rates on the basis of a hypothetical capital structure, stating:

> The Commission cannot support a capital structure for a company such as SJLPC that is so heavily weighted with common equity. The Commission, in its duty to protect the ratepayers, cannot establish rates based on this skewed capital structure. The Commission is of the opinion that if SJLPC chooses to continue with its current debt/equity ra-

tio then its stockholders should bear the burden of its management's decisions and not the ratepayers.

*Id.* at 252. Likewise, in this case, the Commission decided to adopt a capital structure that would protect ratepayers from a management decision, "not to protect management from the consequences of its own decisions." In doing so, the Commission was not acting unreasonably or arbitrarily. This point is denied.

### Expert Witness Qualification

■ In its third point, MGE asserts Commission error in attributing the Panhandle debt to MGE, thus lowering its equity ratio, because its decision was not based on substantial and competent evidence in that the Commission relied on (i) an expert who did not meet the qualifications of section 490.065.1 and (ii) testimony from the Office of Public Counsel and Commission Staff that did not comply with section 490.065.3.[15] Because MGE did not raise the issue of compliance with section 490.065.3 with regard to the *Panhandle debt and equity ratio issues* in its application for rehearing before the Commission, it has not been properly preserved, and we will not consider it further. § 386.500.2.[16]

In addition, MGE does not address in what respect the Commission abused its discretion in refusing to disqualify the witness for the Office of Public Counsel as an expert. *Emerson Elec.*, 963 S.W.2d at 271. We could refuse to consider the matter further under Rule 84.13(a),[17] but will ex-

---

**15.** This section requires that the facts or data upon which an expert bases an opinion "must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable." § 490.065.3.

**16.** The only possible reference MGE makes to this issue in its Application for Rehearing states, "The lower [*return-on-equity*] recommendations of the Commission Staff and Pub-

lic Counsel are based on unreliable data sets, flawed methods, a self-serving selection of conflicting calculations, and are otherwise not competent and substantial evidence for the reasons stated herein."

**17.** Unless otherwise indicated, rule citations are to the Missouri Rules of Civil Procedure (2005).

ercise our discretion under Rule 84.13(c) and address the issue as a matter of plain error.

 Under our standard of review, we must find that the factfinder's ruling "is so arbitrary and unreasonable that it shocks this court's sense of justice and it is clearly against the logic of the surrounding circumstances." *McReynolds v. Mindrup*, 108 S.W.3d 662, 665 (Mo.App. W.D.2002), *abrogated on other grounds, State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146 (Mo. banc 2003). While two separately concurring commissioners disagreed about the experts' credibility and experience, which goes to the weight of their testimony and not to their qualifications, the Commission refused to disqualify any expert witness, and the circuit court found that all of the experts were at least minimally qualified.[18] MGE points to the lack of experience of the expert testifying on behalf of the Office of Public Counsel as evidence that he was unqualified. But under section 490.065.1, training, knowledge, and education can also be considered by a factfinder in qualifying a witness as an expert. Public Counsel's expert was questioned exhaustively about the courses he took in obtaining his undergraduate and graduate degrees, the books and other publications he reviewed after securing employment with the Commission, and the consultations with Mr. Tuck that he engaged in for this proceeding, all of which the Commission was entirely justified in relying on in refusing MGE's repeated requests to disqualify the witness. MGE apparently thought enough of the alternative calculations this witness made using its expert's data, that it used those results, as noted above, in postulating that it could raise rates by as much as $2 million if the Commission were to rely on them.

As well, Mr. Tuck and Dr. Morin, whose qualifications MGE does not challenge, both generally testified that the methods used by Public Counsel's expert were acceptable.[19] Each witness disagreed with some of the inputs and assumptions the others made, but this is to be expected in a discipline that is not a "precise science." And while Dr. Morin has only found a handful of individuals in the United States, including himself, to be truly qualified as regulatory finance experts, in criticizing the methods employed by Public Counsel's witness, he was, perhaps unwittingly, calling into question the reliability and competence of MGE's expert testimony.

Because the Commission's rulings as to Public Counsel's expert do not shock this court's sense of justice and are not clearly against the logic of the surrounding circumstances, we find that the Commission did not abuse its discretion. *McReynolds*, 108 S.W.3d at 665. MGE's third point is denied.

### Return on Equity

According to MGE, the Commission's authorization of a 10.5% return on equity is unlawful, unreasonable, arbitrary, capricious, and not based on substantial or competent evidence because the decision was based on unwarranted speculation and lacks necessary factual findings and was not based on competent and substantial evidence.

---

18. To the extent that the circuit court bases much of its decision on its findings regarding witness credibility, we caution that such findings conflict with our fundamental principles of deference in this regard. *Commerce Bank, N.A.*, 141 S.W.3d at 456–57 n. 19.

19. MGE hired Dr. Morin to rebut the testimony of Staff's expert. In so doing, Dr. Morin testified about a wide range of regulatory finance principles that had application to the testimony of Public Counsel's and MGE's experts.

MGE isolates a single point in the Report and Order to justify the company's claim that the Commission's return-on-equity determination was based on unwarranted speculation and lacked necessary factual findings. In that point, the Commission stated that since MGE's expert thought a return on equity one percentage point higher than the national average would be appropriate, that the company would also find one percentage point lower than the national average acceptable as a starting point.[20] While MGE characterizes this as "tortured reasoning," and not based on the testimony of any witness, it is clear that the basis for the Commission's adoption of a 10.5% return on equity was the result of many other factors, based on both hard data and educated assumptions. To the extent that each expert witness expressed his return-on-equity recommendation as a range with a high and low percentage for the Commission's consideration, it was not unreasonable or arbitrary for the Commission to attribute such reasoning to MGE's expert.

MGE also claims that although the Commission was correct in determining that return on equity had to be adjusted higher to account for the greater risk in the company's capital structure, its decision to adjust the rate by only half a percentage, or by 50 basis points, was not based on substantial or competent evidence. MGE points to the testimony of its expert, criticizing the basis-point adjustments made by the expert who testified on behalf of Commission Staff, as the only competent and substantial evidence with respect to an equity adjustment for capital structure. MGE further argues that the contrary testimony of Staff's expert was not admissible under the requirements of section

490.065.3 because it was not based on facts or data of the kind reasonably relied on by experts in the field. As noted above, MGE did not properly preserve this issue for review, so we are left with conflicting competent testimony in a field particularly within the Commission's area of expertise and must defer to its decision under our standard of review. *Friendship Vill.*, 907 S.W.2d at 345. This point is denied.

For these reasons we reverse the circuit court and affirm the Commission's Report and Order.

EDWIN H. SMITH, C.J., and LISA WHITE HARDWICK, JJ., concur.

---

**20.** MGE's argument is framed in terms of "basis points"; apparently, in the world of economic argot, one percent is equal to 100 basis points. Thus, MGE complains that the Commission erred by speculating that MGE would find appropriate a return on equity that ranged 100 basis points above and 100 basis points below the national average.