STATE of Missouri ex rel. MISSOURI
OFFICE OF the PUBLIC COUNSEL,
Relator–Appellant,

v.

PUBLIC SERVICE COMMISSION
OF the STATE of Missouri,
Respondent–Respondent.

Missouri Gas Energy, a Division of
Southern Union Company,
Plaintiff–Appellant,

v.

Public Service Commission of the State
of Missouri, Defendant–
Respondent.

Nos. SD 29278, SD 29308,
SD 29297, SD 29320.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 28, 2009.

Application to Transfer to Supreme
Court Denied Nov. 17, 2009.

64

Marc Poston, Senior Counsel, Office of the Public Counsel, Jefferson City, MO, for appellant, Office of the Public Counsel, (Nos. SD29278 & SD29308).

James C. Swearengen, Diana C. Carter, and Paul A. Boudreau, Brydon, Swearen-

gen & England, P.C., Jefferson City, MO, and Douglas S. Evans, Evans & Green, L.L.P., Springfield, MO, for appellant, Missouri Gas Energy (Nos. SD29297 & SD29320).

Jennifer Heintz and Peggy A. Whipple, Jefferson City, MO, for respondent, Public Service Commission of the State of Missouri.

GARY W. LYNCH, Chief Judge.

The Office of Public Counsel ("OPC") and Southern Union Company ("Southern Union") separately appeal from the circuit court's affirmance of a Public Service Commission ("the Commission") Report and Order ("the Order"). The resolutions of both appeals are consolidated in this opinion.

OPC raises three points of Commission error: (1) the Order as related to the adopted rate design does not contain sufficient findings of fact and conclusions of law, is not supported by competent and substantial evidence, and is arbitrary, capricious, and an abuse of the Commission's discretion; (2) the Order permits Southern Union to recover the cost of software no longer being used to provide service to its customers, in violation of section 393.130 [1]; and (3) the Order permits Southern Union to recover costs that cannot be attributed to compliance with the Cold Weather Rule Emergency Amendment, in violation of 4 C.S.R. 240–13.055.

In its appeal, Southern Union also raises three points of Commission error: (1) the Order retains the use of a 30–year weather normalization methodology, when the competent and substantial evidence supports a 10–year rolling method; (2) the Order retains the use of Southern Union's actual capital structure, when a hypothetical capital structure more aligned with the interests of its operating division, Missouri Gas Energy ("MGE"), should have been used; and (3) the Order improperly includes in the capital structure calculation the debts of one of Southern Union's subsidiary companies, creating an unlawful and unreasonable confiscatory rate.

Finding no merit in any of the parties' points, this Court affirms the Commission's Order.

### Factual and Procedural Background

MGE is an operating division of Southern Union,[2] and has conducted business in Missouri since 1994. Southern Union "owns and operates assets in the regulated and unregulated natural gas industry and is primarily engaged in the gathering, processing, transportation, storage, and distribution of natural gas in the United States." Over the last few years, Southern Union has been in the process of transforming itself from primarily a natural gas distribution utility to a more diversified natural gas service provider, and is currently viewed in the financial sector as a midstream natural gas company, i.e., a middleman of sorts between the producers of natural gas and those who deliver it to consumers. MGE operates as a local distribution company that purchases natural gas from a supplier, transports it through interstate pipelines to Missouri, and then

---

**1.** All statutory references are to RSMo 2000 unless otherwise indicated.

**2.** The Order noted: "As a division, MGE has no separate corporate existence apart from Southern Union." For the convenience of both the parties and the readers of this opinion, this Court will use the term "MGE" to refer to the business operations of this division of Southern Union as distinguished from any other business operations conducted by Southern Union. Such usage should not be construed as an indication that MGE has any legal status as an entity separate and apart from Southern Union.

sells it to both residential and commercial customers. MGE's territory covers the western third of Missouri, including Kansas City, St. Joseph, Joplin, and Monett, and consists of approximately 500,000 customers. As an operating division of Southern Union, MGE has no capital structure of its own, and does not have investors in its own right.

On May 1, 2006, Southern Union filed tariff sheets with the Commission asking for an annual revenue increase of approximately $41 million, to be accomplished via a number of significant changes to the utility's rate design and Commission-authorized rate of return. The tariff carried an effective date of June 2, 2006. On May 12, 2006, the Commission suspended the tariff until March 30, 2007, the maximum suspension allowed by law.

On July 13, 2006, the Commission established the test year for this case as the 12–month period ending December 31, 2005, with an update period for known and measurable changes through June 30, 2006. All parties to the case then settled on a further true-up period ending October 31, 2006, for the purpose of updating particular cost components. Finally, the Commission determined a procedural schedule for the case, with the hearing set to begin January 8, 2007.

Local public hearings regarding the rate case were held in Kansas City, Joplin, Republic, Warrensburg, Nevada, St. Joseph, and Slater, Missouri. At these hearings, the Commission heard comments from MGE customers regarding the request for a rate increase. Additionally, Southern Union, OPC, and the staff of the Commission [3] ("Staff") pre-filed direct, rebuttal, and surrebuttal testimony from their respective witnesses. During the actual hearing, which ran from January 8

through January 17, 2007, all three entities also entered into evidence true-up testimony; the true-up hearing was ultimately deemed unnecessary and was canceled with the consent of all involved.

Following the evidentiary hearing, the Commission issued the Order on March 22, 2007, with an effective date of March 30, 2007. In the Order, the Commission granted, *inter alia*, Southern Union's requests to (1) change the fundamental structure of its rates from the traditional volumetric design to a straight-fixed variable ("SFV") design; (2) amortize the cost of software no longer serving as the primary software for everyday operations of the company; and (3) recover costs lost to Southern Union due to compliance with the Cold Weather Rule Emergency Amendment. The Commission denied, however, *inter alia*, Southern Union's requests to (1) use a rolling, 10–year heating degree day average when calculating cost of service instead of the traditional static 30–year average; (2) employ a hypothetical capital structure in determining an appropriate rate of return; and (3) exclude the debt of Panhandle Eastern Pipeline ("Panhandle"), a subsidiary company of Southern Union, from the calculation of Southern Union's percentage of long-term debt in determining the appropriate capital structure. Both OPC and Southern Union filed applications for rehearing, which were denied, and both then filed petitions for writ of review with the Greene County Circuit Court. That court found the Order to be just and reasonable, and this appeal followed. All other pertinent facts are set out *infra*.

### Standard of Review

"In an administrative appeal, we review the agency's findings and decisions and not

3. The Staff pre-filed testimony and conducted cross-examination during the hearing per its

usual routine in rate cases; the Staff is not an actual party to this action.

the circuit court's judgment." *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n,* 186 S.W.3d 376, 381 (Mo.App.2005) (citing *Friendship Village of S. County v. Pub. Serv. Comm'n of Mo.,* 907 S.W.2d 339, 344 (Mo.App.1995)). Our review consists of two parts: first, we determine whether the Commission's order is lawful; second, we determine if the order is reasonable and supported by "competent and substantial evidence upon the whole record." *Id* In reaching a conclusion on the issue of lawfulness, this Court "exercise[s] unrestricted, independent judgment and correct[s] any erroneous interpretations of law." *Id.* We must also examine "whether the Commission had the statutory authority to act as it did" in issuing its order. *Union Elec. Co. v. Pub. Serv. Comm'n,* 136 S.W.3d 146, 152 (Mo.App.2004). In assessing an order's reasonableness, this Court determines whether "(i) the order is supported by substantial and competent evidence on the whole record, (ii) the decision is arbitrary, capricious or unreasonable, or (iii) the Commission abused its discretion." *Mo. Gas Energy,* 186 S.W.3d at 382 (citing *Friendship Village,* 907 S.W.2d at 344–45).

In our review, there is a presumption that the Commission's order is valid, and the burden rests on the party challenging it to prove its invalidity. *Mo. Gas Energy,* 186 S.W.3d at 381–82 (citing *Friendship Village,* 907 S.W.2d at 344). We view all evidence, as well as all reasonable supporting inferences, in the light most favorable to the Commission's order. *Friendship Village,* 907 S.W.2d at 345. "[I]f substantial evidence supports either of two conflicting factual conclusions, '[we are] bound by the findings of the administrative tribunal.'" *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 735 (Mo. banc 2003) (quoting *Amway Corp. v. Dir. of Revenue,* 794 S.W.2d 666, 668 (Mo. banc 1990)). The determination of witness credibility is solely within the discretion of the Commission, "'which is free to believe none, part, or all of [a witness's] testimony.'" *Mo. Gas Energy,* 186 S.W.3d at 382 (quoting *Commerce Bank, N.A. v. Blasdel,* 141 S.W.3d 434, 456–57 n. 19 (Mo.App. 2004)). Essentially, this Court will not reweigh the evidence to reach its own conclusion. *State ex rel. Assoc. Natural Gas Co. v. Pub. Serv. Comm'n,* 706 S.W.2d 870, 874 (Mo.App.1985). "It is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside." *Mo. Gas Energy,* 186 S.W.3d at 382 (citing *Friendship Village,* 907 S.W.2d at 345). Finally, "where a decision rests on the exercise of regulatory discretion, we will not substitute our judgment for that of the Commission, particularly on issues within its area of expertise." *Id.*

### Discussion

OPC and Southern Union each present three points for our review in their respective appeals. Each point will be addressed in the order presented, beginning with OPC's appeal.

### A. OPC's Appeal—Nos. SD29278 and SD29308

### I. Commission's Adoption of the SFV Rate Design is Lawful and Reasonable

At the outset, we note that OPC's first point relied on fails to comply with Rule 84.04. Rule 84.04(d)(2) states,

> (2) Where the appellate court reviews the decision of an administrative agency, rather than a trial court, each point shall:
>
> (A) identify the administrative ruling or action the appellant challenges;
>
> (B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

OPC's first point relied on omits the last requirement, reading,

> The Public Service Commission's Report and Order is: 1) unlawful because the rate design decision does not include sufficient findings of fact and conclusions of law; and 2) unreasonable because the rate design decision is not based on competent and substantial evidence, is arbitrary, capricious, and constitutes an abuse of discretion.

OPC proffers no contextual references to the facts of this case in its point. Such an omission is grounds for dismissal. *See Hurn v. Schoen Equip., Inc.*, 253 S.W.3d 587, 589 (Mo.App.2008); *Richmond v. Springfield Rehab & Healthcare*, 138 S.W.3d 151, 153 (Mo.App.2004); *M.C. v. Yeargin*, 11 S.W.3d 604, 611 (Mo.App. 1999). Nevertheless, "[t]his type of case is by its very nature impressed with a public interest; substantial business and private interests and investments are involved; and, this court is reluctant to forgo its judicial function to decide the matter on the merit s, because of a failure of counsel

to obey the mandate of the Rule." *State ex rel. Oliver v. Pub. Serv. Comm'n*, 542 S.W.2d 595, 597 (Mo.App.1976).[4]

This Court discerns from the argument section of OPC's brief that the contextual bases supporting OPC's legal reasons for error are as follows: first, that the Order is unlawful because on its face it lacks a sufficient recitation of facts on which the Commission could have based its rate design[5] decision in that "the rate design discussion mostly recites the positions of each party and then makes an unsupported and unexplained finding"; and second, that the Commission's rate design decision is unreasonable because (a) the subsidization finding is unsupported by the evidence in that the evidence presented by the Staff's only witness on this issue "lacked any empirical evidence to support her bald conclusion" and the remaining evidence presented by the Staff was contradictory; (b) the adoption of the SFV rate design is arbitrary, capricious, and an abuse of discretion in that the Commission failed to consider what impact the change in rate design would have on consumers; and (c) the conservation and efficiency finding is unsupported by the evidence in that the evidence supported a finding that "[t]he

---

4. OPC's remaining points relied on are similarly deficient; we will likewise exercise our discretion and review OPC's remaining points on their merits in the context of this case as gleaned from the argument section of OPC's brief.

5. " 'Rate design' is the method used to determine the rates to be charged to individual classes of customers." *State ex rel. Monsanto Co. v. Pub. Serv. Comm'n of Mo.*, 716 S.W.2d 791, 791 (Mo.1986). In the case at hand, the Commission found:

> Historically, MGE has operated under a rate design that allows it to recover a portion of its fixed cost through a customer charge. The remaining portion is recovered through volumetric rates, the amount of gas MGE sells to its customers. Current-

ly, MGE recovers 55% of its fixed cost through a customer charge and 45% of its fixed cost through volumetric rates. Since 1996, the annual average usage per residential customer has generally declined. MGE posits that because of this decline, coupled with the fact that 90% of its customer base is residential, it has been unable to earn its Commission authorized rate of return. Hence, MGE seeks Commission approval of a Straight–Fixed Variable (SFV) rate design for the Residential class because of the under-recovery of its costs through volumetric rates and because of the high degree of heat sensitivity effecting [sic] the class. The SFV design is one through which the company will recover all of its fixed costs through a fixed, monthly customer charge.

traditional rate design [6] allows a customer to see greater benefit from their own conservation and energy efficiency efforts than a SFV rate design."

### (a) The Order as Related to Rate Design is Lawful

 The lawfulness of an order can be challenged in three ways: (1) whether the Commission had the statutory authority to act as it did; (2) whether the Commission's findings of fact within its order are sufficient; and (3) whether the Commission misapplied or misinterpreted the law in its decision. *See Mo. Gas Energy,* 186 S.W.3d at 384. OPC challenges the lawfulness of the Order as related to rate design on the second of these grounds.

Other than citing cases discussing the sufficiency of Commission findings of fact in general, the entirety of OPC's substantive argument on this particular issue in the context of this case reads:

The Commission's rate design decision does not contain sufficient findings of fact and conclusions of law to enable the Court to determine the basis for the Commission's decision. After discussing the various positions of the parties, the Commission approved the SFV rate design by finding "MGE['s] and Staff's arguments for a rate design that will protect MGE from the vagaries of weather to be persuasive." The Commission failed to identify which evidence it found to be persuasive and which evidence it found unpersuasive and why. The rate design discussion mostly recites the positions of each party and then makes an unsupported and unexplained finding.

MGE and Staff made many arguments and the Order fails to identify which argument and which evidence persuaded the Commission to adopt the SFV rate design.

When a party challenges the Commission's findings of fact, we review the Commission's decision to determine whether the findings of fact are "sufficiently definite and certain under the circumstances of the particular case to enable the court of review to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence." *Friendship Village,* 907 S.W.2d at 347–48. It is not, however, "required for the validity of administrative findings that [the Commission] go into evidentiary detail." *Citizens State Bank v. State Banking Bd.,* 602 S.W.2d 895, 899 (Mo.App.1980). Rather, this Court must generally be able to discern the facts on which the Commission's order was based from the order itself. *State ex rel. Assoc. Natural Gas Co. v. Pub. Serv. Comm'n,* 37 S.W.3d 287, 295 (Mo.App.2000); *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n,* 976 S.W.2d 485, 496 (Mo. App.1998).

As OPC notes, the Commission laid out, in detail and with historical background, the arguments of Southern Union, Staff, and OPC. These recitations included the ultimate facts supporting each of the respective arguments related to the rate design. Throughout its synopsis of the various arguments, the Commission also inserted several editorial comments revealing its own inclinations on various positions.[7] It then stated, "The Commis-

---

6. This opinion adopts the parties' use of the phrase "traditional rate design" to reference Southern Union's historical existing rate design as identified and discussed by the Commission in the Order as quoted in footnote 5, as opposed to the new SFV rate design adopted in the Order.

7. For example, when articulating OPC's position against any change in rate design, the Commission stated,

> Although [OPC] opposes the SFV design, as a participant in an energy task force it agreed that the Commission should incor-

sion finds MGE['s] and Staff's arguments for a rate design that will protect MGE from the vagaries of weather to be persuasive. The Commission shall approve the SFV rate design for MGE's residential class." As stated *supra,* this Court views all supporting inferences in favor of the Commission. *Friendship Village,* 907 S.W.2d at 345. Better practice would dictate the explicit identification of the facts determined by the Commission. Nevertheless, the implicit determination of those facts—by reasonably inferring that if the Commission found arguments "persuasive" and ruled in accordance with those arguments, then the Commission necessarily determined that the facts underlying those arguments are true—provides an adequate basis for this Court to "review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence." *Id.* at 347–48. As such, the Order is lawful.

### (b) The Order as Related to Rate Design is Reasonable

In arguing that the Order is unreasonable, OPC focuses on three alleged deficiencies in the Commission's decision: (1) lack of competent and substantial evidence concerning purported subsidization under the traditional volumetric rate design; (2) an arbitrary, capricious, and abuse-of-discretion failure of the Commission to consider the consumer impact of the change in rate design; and (3) lack of competent and substantial evidence concerning an increased incentive for MGE to support conservation under the SFV rate design. This Court finds no such deficiencies.

porate rate designs that remove the disincentive for utilities to pursue programs aimed as [sic] reducing usage. [OPC's] recommendation in support of the current rate design does not remove the company's disincentive to pursue programs aimed as

### (1) Subsidization is supported by substantial evidence

For an order of the Commission to be found reasonable, it must be supported by substantial and competent evidence. *Friendship Village,* 907 S.W.2d at 344. Evidence is deemed "substantial" when it is probative of the issues for which it was offered to prove. *Gregory v. Detroit Tool & Engineering,* 266 S.W.3d 844, 846 n. 3 (Mo.App.2008); *State ex rel. Utility Consumers Council of Missouri, Inc. v. Pub. Serv. Comm'n,* 562 S.W.2d 688, 692 (Mo.App.1978). Evidence is deemed "competent" when it is relevant and admissible. *Byous v. Missouri Local Gov't Employees Ret. Sys. Bd. of Trustees,* 157 S.W.3d 740, 744 (Mo.App.2005).

In arguing for the adoption of the SFV rate design, Staff took the position that the traditional rate design, based upon volume, causes high-use customers to subsidize the cost of low-use customers. OPC argues that this position, found persuasive by the Commission, is not supported by substantial and competent evidence because the testimony of Staff's only witness on this issue, Ann Ross, "lacked any empirical evidence to support her bald conclusion[,]" and the other evidence presented by Staff on this issue was "contradictory evidence that both recognizes demand costs and ignores demand costs."

We need not reach these issues, however, because, although OPC limits its challenge to just the evidence presented by Staff, the Commission in making its decision was not so limited. Russell Feingold, testifying on behalf of Southern Union,

[sic] reducing natural gas usage. As discussed above, the SFV design does just that. Also, as discussed above, declining customer usage coupled with the current rate design, will exacerbate MGE's inability to recover it [sic] fixed costs.

also discussed intra-class subsidization as an issue under the traditional volumetric rate design, as well as the elimination of such subsidization under the SFV rate design. Phillip Thompson, also testifying on behalf of Southern Union, explained in great detail how natural gas usage varies between socioeconomic classes, the disproportionate level of costs borne by low-income natural gas consumers, and how the SFV rate design would prevent low-income, high-usage consumers from subsidizing high-income, low-usage consumers.[8] OPC neither objected to the admission of either witness's testimony at the hearing on the issue of subsidization nor challenges the Commission's reliance on that testimony as substantial and competent evidence of such subsidization in its decision to adopt the SFV rate design. Irrespective of the validity of OPC's alleged deficiencies in the evidence presented by Staff, the testimony of Feingold and Thompson provided substantial and competent evidence of subsidization.

■ *(2) The Commission considered the consumer impact of the change in rate design*

OPC's contention that the Commission acted arbitrarily, capriciously, and abused its discretion by neglecting to consider the impact such a change in rate design would have on consumers is unfounded. At least four separate considerations of consumer impact are present in the rate design section of the Order: high-use consumers will stop paying a disproportionate share of the operating expenses of MGE; month-to-month volatility of bills will be reduced; consumers will still retain control over a majority of their monthly natural gas costs; and ratepayers' interests will be aligned with those of Southern Union's shareholders because of the removal of the disincentive for MGE to encourage natural gas conservation. Simply because these considerations are not stated repeatedly throughout the Order, contained within a single paragraph, worded in a certain manner, or resolved or weighed by the Commission in the manner as urged by OPC does not lessen their effect or negate the fact that they were considered by the Commission in adopting the SFV rate design.

*(3) MGE's incentive for conservation is supported by substantial evidence*

■ In its Order, the Commission states,

An additional benefit of the proposed rate design, set out by Staff and [MGE], is that the objective[s] of the shareholders and ratepayers will be better aligned because the utility's revenues will no longer depend on how much gas it sells. Currently, MGE has an incentive to sell more gas to at least recover its costs. The current rate design therefore discourages natural gas conservation efforts on the part of [MGE]. If the SFV design is adopted, the company is committed to offering several natural gas conservation initiatives.

The Order also notes OPC's own admission that "the Commission should incorporate rate designs that remove the disincentive for utilities to pursue programs aimed as [sic] reducing usage." The Commission

---

8. The additional unchallenged evidence in this case distinguishes it from the situation confronted by the Western District of this Court in *State ex rel. OPC v. Mo. Pub. Serv. Comm'n*, 289 S.W.3d 240 (Mo.App. W.D. 2009). In that case, the only evidence in support of subsidization was the testimony of Ms. Ross, which the Western District found not to be substantial and competent evidence. *Id.* at 247–48. Because of the additional unchallenged evidence here, this Court need not address the quality of Ms. Ross's testimony in this case, as urged by OPC.

further notes OPC's admissions that "under the SFV design[,] customers would save by reducing their natural gas usage[,] ... [and] that customers will not pay as much in colder-than-normal winters." Finally, the Order differentiates between past OPC opposition to the SFV rate design based on conservation by noting, "[OPC] opposed the SFV design as unjustifiable in a separate matter because the company had not proposed any meaningful conservation programs. Notwithstanding, in this matter MGE has proposed conservation programs."

First, OPC misses the mark on the particular type of conservation with which the Commission was concerned in this part of its Order. OPC's brief focuses on the lessened ability of the consumer to control his or her monthly bill under the SFV rate design because a smaller portion of each bill will rely on the amount of gas purchased that month; OPC argues that such a shift in rate design will actually discourage conservation on the part of the consumer, as consumers using less gas will not see a corresponding reduction in their monthly costs.[9] While it was appropriate for OPC to make this argument to the Commission in its effort to influence the Commission's consideration of the weight to give various factors in its decision to adopt a particular rate design, this argument is totally unrelated to whether the Commission's determination that the SFV rate design will cause MGE to increase encouragement for conservation is supported by substantial evidence. Second, even if OPC had focused its attention on incentives for MGE to encourage natural gas conservation, as the Commission did in its Order, there was substantial and competent evidence presented to the Commission to support that determination.

Numerous witnesses testified as to the basic structure of the SFV rate design, which recovers all fixed costs through a fixed monthly charge, and of the traditional volumetric rate design, which, in this case, recovers 45% of the fixed costs through a rate connected with a consumer's level of usage. It is reasonable to infer from this testimony that, under a volumetric rate design, MGE has an incentive to sell more gas, as it consequently would recover a higher portion of its fixed costs upon such sales. It is likewise reasonable to infer that decoupling the fixed and varying costs would eliminate that incentive, as the charge for the actual natural gas used by the consumer is passed on dollar for dollar from MGE to its customers. Additionally, Southern Union proposed two conservation programs that MGE is prepared to create upon adoption of the SFV rate design. The first is a $45,000 energy audit and education program, designed to assist consumers in determining what energy-efficient improvements they can make to their homes. The second is a $705,000 water heater rebate program; the program would provide a rebate to consumers either converting from an electric to a gas water heater or replacing an outdated gas water heater. These conservation programs were specifically approved by the Commission in the Order.

OPC's first point is denied.

## II. Amortization of Software is Lawful

▮ In its second point, OPC contends that the Order is unlawful because it permits the continued amortization of comput-

---

9. Nevertheless, evidence was put before the Commission indicating that, even under the SFV rate design, actual natural gas usage costs would still constitute approximately 75% of the average consumer's bill. Thus, the consumer's conservation efforts would still directly impact that portion of his or her bill.

er software no longer used to provide service to consumers. In particular, OPC argues that allowing MGE to amortize $1.23 million over a 5-year period for the remaining cost of the software violates section 393.130, because such an allowance is unjust and unreasonable. This Court disagrees.

MGE purchased the Infinium software at issue in 1995; the software had an estimated useful lifetime of approximately 10 years. Over the next decade, the original investment was almost fully amortized. Each year, however, from 1995 through 2001, enhancements and modifications to the Infinium system were purchased; instead of amortizing the value of such enhancements and modifications over the remaining lifespan of the original Infinium software, each additional purchase was given a new 10-year amortization period. Thus, approximately $1.23 million of the overall Infinium investment remains to be amortized.

In 2005, MGE purchased a new software program, Oracle. The company is currently amortizing the value of the Oracle software. After the switch in software, MGE continued to use Infinium for time-keeping purposes. At the time of the hearing, Southern Union indicated that MGE intended to continue using the Infinium program for timekeeping until March 2007. Southern Union also indicated that MGE had removed the remaining Infinium value from its rate base calculations.

Both Southern Union and Staff proposed that the remaining $1.23 million be amortized over a 5-year period. OPC opposed the amortization based upon the Western District of this Court's decision in *State ex rel. Union Elec. v. Pub. Serv. Comm'n*, 765 S.W.2d 618 (Mo.App.1988), in which the Court stated,

The property upon which a rate of return can be earned must be utilized to provide service to its customers. That is, it must be used and useful. This used and useful concept provides a well-defined standard for determining what properties of a utility can be included in rate base.

*Id.* at 622. OPC further references section 393.270, which allows the Commission to set public utility rates "for the service to be furnished." Section 393.270.2. According to OPC, once MGE replaced the Infinium software as its primary program, Infinium was no longer used to provide service to MGE customers and the company is disallowed from recovering any remaining Infinium costs.

OPC, however, interprets the *State ex rel. Union Elec.* holding too broadly. The *State ex rel. Union Elec.* Court's statement in that case expressly dealt with rate base, and what is acceptable to be included in rate base.

The determination of utility rates focuses on four factors. These factors include: (1) the rate of return the utility has an opportunity to earn; (2) the rate base upon which a return may be earned; (3) the depreciation costs of plant and equipment; and (4) allowable operating expenses.... The revenue allowed a utility is the total of approved operating expenses plus a reasonable rate of return on the rate base. The rate of return is calculated by applying a rate of return to the cost of property less depreciation. The utility property upon which a rate of return can be earned must be utilized to provide service to its customers. That is, it must be used and useful. This used and useful concept provides a well-defined standard for determining what properties of a utility can be included in its rate base.

*State ex rel. Union Elec.*, 765 S.W.2d at 622 (citing Roger Colton, *Excess Capacity: Who Gets the Charge from the Power*

*Plant?*, 34 HASTINGS L.J. 1133, 1134 (1983)).

> A utility's rate base is the capital investment devoted to, and necessary for, providing reasonable adequate service to customers. Rate base investments include power plants, transmission lines, office space for utility operations, and equipment with a useful life of one or more years. A utility company is entitled to a rate of return only on investments included in its rate base.

Colton, *Excess Capacity, supra* at 1134–35. As Southern Union made clear to the Commission, the Infinium software has been removed from MGE's calculations of rate base, and the company is not asking to make a profit on the remaining investment costs but, rather, to simply recover those costs by continuing to amortize them without earning a corresponding rate of return. *State ex rel. Union Elec.* is inapplicable to this request.

The only other authority cited by OPC in support of its contention on this point is *State ex rel. City of St. Louis v. Pub. Serv. Comm'n*, 329 Mo. 918, 47 S.W.2d 102 (1931), which likewise misses the mark. In *City of St. Louis*, the relevant issue was again the property included in determining the utility's rate base. *Id.* at 111. The Court in that case stated, "A public utility is entitled to *earn a reasonable sum* for depreciation of its property, including necessary retirements, ordinary obsolescence and diminishing usefulness which cannot be arrested by repairs, but not including extraordinary obsolescence, so called, or extensive supersessions of property or equipment, nor including past depreciation." *Id.* (citations omitted) (emphasis added). The *City of St. Louis* Court is clearly referencing the utility's ability to earn a reasonable rate of return, which is derived solely from rate base. The inclu-

sion of the Infinium software in rate base is not an issue in this case.

This Court presumes the Commission's decision is valid, and it is up to the challenging party to rebut that presumption. *Mo. Gas Energy*, 186 S.W.3d at 381–82 (citing *Friendship Village*, 907 S.W.2d at 344). Because OPC provides no applicable authority supporting its position that amortization of the Infinium software is unlawful, this Court finds no error in the Commission's decision. OPC's second point is denied.

### III. Recovery of Cold Weather Rule Emergency Amendment Costs is Lawful

 OPC's final point challenges the Commission's decision to allow MGE to recover costs incurred by the company in compliance with the Cold Weather Rule ("CWR") Emergency Amendment. OPC contends that the costs MGE seeks to recover cannot be attributed to compliance with the CWR, and therefore their recovery is in violation of 4 C.S.R. 240–13.055. This Court disagrees.

Missouri gas utilities have for many years provided natural gas service under special payment and credit provisions designed to assist customers, particularly those with limited means, in restoring or maintaining their gas service during the winter heating season. These special provisions, commonly known as the CWR, are set forth at 4 C.S.R. 240–13.055.

Due to sharp rises in the price of natural gas in the fall of 2005, the Commission promulgated an emergency rule ("Emergency Amendment") effective December 26, 2005, amending the CWR. The Emergency Amendment added a new section 14 to the CWR applicable only to natural gas utilities which, among other things, reduced the upfront payment for past-due balances that a customer was required to

pay to restore or maintain utility service during the winter of 2005–2006. 4 C.S.R. 240–13.055(14)(A).

On August 11, 2006, the Commission issued an Order of Rulemaking adopting a permanent amendment ("Permanent Amendment") to the CWR, effective November 1, 2006, which continued many of the terms of the Emergency Amendment, including the terms requiring reduced up-front payments of past-due balances. 4 C.S.R. 240–13.055(14)(A). Under both the Emergency Amendment and the Permanent Amendment, customers were allowed to register for a CWR payment plan by making an upfront payment of the lesser of 50% of the customer's past-due balance or $500, whereas customers prior to either amendment were required to pay 80% of their past-due balance to restore or maintain utility service. *Compare* 4 C.S.R. 240–13.055(14)(A) *with* 4 C.S.R. 240–13.055(10)(C)(2).

Both amendments authorized natural gas utilities to recover the costs of complying with the amendments and specified how those costs were to be calculated and recovered. 4 C.S.R. 240–13.055(14)(F). This recovery is implemented by a utility's request for an accounting authority order ("AAO") allowing the company to book all costs incurred as a result of the rule. 4 C.S.R. 240–13.055(14)(G).

In the Order in the instant case, the Commission found as follows:

MGE is requesting about $900,000 through an AAO as a result of complying with the [Emergency Amendment]. On September 21, 2006, the Commission issued an order granting authority for an AAO for cost incurred under the cold-weather rule. In that order, the Commission directed the parties to brief and present testimony on this issue. Staff testified that $901,331 represents the difference between the amount that the company could have collected under the old cold weather rule and the amount that MGE actually collected. Staff recommends that this amount be amortized over three years. Consistent with the Commission's order of September 21, 2006, the Commission will grant MGE's request to amortize the deferred cost through an AAO and finds that $901,331 shall be amortized over a three-year period.

OPC challenges this allowance as being unlawful in that it is not authorized by the Emergency Amendment because these costs cannot be attributed to compliance with the Emergency Amendment, and only costs attributed to compliance with the Emergency Amendment are recoverable. OPC supports this contention with a sub-section-by-subsection analysis of section 14 of the Emergency Amendment, concluding: "Therein lies an ambiguity between subsections 4 C.S.R. 240–13.055(14)(F)(2), prohibiting recovery of costs MGE would have incurred without the CWR, and 4 C.S.R. 240–13.055(14)(F)(4), allowing recovery of costs MGE would have incurred without the CWR amendment. This example also shows how 4 C.S.R. 240–13.055(14)(F)(2) is inconsistent with the language of 4 C.S.R. 240–13.055(14)(G)(1)." This Court need not, however, address or resolve any of OPC's alleged ambiguities or inconsistencies in the Emergency Amendment because the issue is squarely addressed in and resolved by the Permanent Amendment.

In its respondent's brief, Southern Union points out that the Permanent Amendment not only addresses the recovery of this specific type of cost, but also specifically applies the recovery of this type of cost to recovery under the Emergency Amendment. OPC did not respond to this contention in its reply brief.

The Permanent Amendment in 4 C.S.R. 240–13.055(14)(F) provides, in part:

4. No bad debts accrued prior to the effective date of this section may be included in the costs to be recovered under this section, *provided that a gas utility may continue to calculate and defer for recovery through a separate Accounting Authority Order the costs of complying with the commission's January 1, 2006 emergency amendment to this rule upon the same terms as set forth herein. The costs eligible for recovery shall be* the unpaid charges for new service received by the customer subsequent to the time the customer is retained or reconnected by virtue of this section plus *the unpaid portion of the difference between the initial payment paid under this section and the initial payment that could have been required from the customer under the previously enacted payment provisions of section (10) of this rule, as measured at the time of a subsequent disconnection for nonpayment or expiration of the customer's payment plan.*

4 C.S.R. 240–13.055(14)(F) (emphasis added). Thus, the cost recovery in the Order challenged by OPC as not legally authorized under the Emergency Amendment is specifically authorized by the Permanent Amendment, which was in effect at the time the Commission issued the Order. OPC does not argue or contend otherwise. Therefore, this portion of the Order allowing such recovery in accordance with the specific provisions of the Permanent Amendment is lawful. OPC's third point is denied.

### B. Southern Union's Appeal–Nos. SD29297 and SD29320

### I. 30–Year Weather Normal is Supported by Competent and Substantial Evidence

█ In its first point, Southern Union contends that the Commission erred in continuing to use a 30–year weather normal instead of a 10–year rolling weather normal as it proposed. Southern Union contends that

the competent and substantial evidence demonstrated that the 10–year [heating degree day] average is the best predictor of temperatures for the following two years, that the trend in weather has been increasing warmth with average weather measurements of the distant past having no logical bearing on predicting temperatures for the future, and that the Commission failed to engage in forward-looking ratemaking with regard to weather normalization.

This Court disagrees.

A "heating degree day" ("HDD") is a weather measure "devised to evaluate energy demand and consumption." Such days "are based on how far the daily average temperature departs from the base level of 65 degrees Fahrenheit[.]" They are used to quantify and examine the relationship between temperature and natural gas consumption for residential users. HDDs are calculated by determining "the number of degrees the daily average temperature is below 65 [degrees Fahrenheit]"; HDDs are set to zero when the daily average temperature is above that mark. When examined over a 30–year period, these averages create a "weather normal" that is then compared to a "test year" in order to help determine the appropriate rate of return and usage standards that should be implemented in constructing utility rates.

In the relevant section of the Order, the Commission again laid out the positions of the parties. It then issued its ruling:

As noted above, the Commission has historically used the 30–year normal.

As MGE has stated, under the SFV rate design this will not be an issue for 90% of the company's customers. The Commission continues to use the 30-year normal and finds that it should be consistent when applying a method of weather normalization between utilities. In the absence of more convincing evidence that this methodology should be changed, the Commission will continue to adopt the 30-year weather normalization as proposed by Staff.

Evidence was presented to the Commission in support of both the 10-year and 30-year HDD models. Southern Union's sole witness on this issue, Russell Feingold, testified that he conducted statistical analyses of 30-year, 20-year, 10-year, and 5-year "weather normal" averages, with the 10-year average being the best predictor of future weather for the following two years. Specifically, Feingold testified that the 10-year rolling average would best reflect increasing climate volatility, and would better allow Southern Union the opportunity to recover its authorized rate of return.

Notably, Southern Union conceded that under the SFV rate design adopted by the Commission, such variability and vulnerability are virtually eliminated with respect to the company's residential class, which comprises approximately 90% of MGE's customers. This is because all of the company's fixed costs would be recovered through a fixed monthly fee; none of the fixed costs would be dependent upon the sale of natural gas.

Staff presented three witnesses in support of its proposed continuation of the 30-year HDD model, using the National Oceanic and Atmospheric Administration ("NOAA") statistical weather normal. Staff's first witness, Regulatory Economist Curt Wells, testified regarding the definition of HDD and NOAA's method of calculating its 30-year weather normal; he further testified that use of anything other than the 30-year standard "is inconsistent with international meteorological convention, Commission rulings, and the purpose of adjusting volumes to normal HDDs in Missouri [Commission] rate cases." Wells went on to describe NOAA's standardization of its "normal" temperatures, during which NOAA "processes and screens the data to correct for 'any inconsistencies in observational practices (e.g., changes in station location, instrumentation, time of observation, etc.) and be serially complete (i.e.[,] no missing values.)'" Wells criticized Southern Union's proposed 10-year rolling average for using data that had not yet gone through this process. Also within Wells's pre-filed testimony was testimony from climatologists in previously filed rate cases, which listed stability, conformance with other states and the National Weather Service, and consistency of measurement instruments in support of the 30-year standard. Wells emphasized that the shorter the period used to calculate the "normal" temperature, the more impact an unusual meteorological event would have on the ultimate outcome. Wells also noted that no other utility in Missouri uses anything other than the 30-year NOAA standard. Ultimately, Wells stressed that since neither the 30-year nor the 10-year models are very accurate predictors of future weather conditions, stability and resistance to unusual weather occurrences should be the deciding factor in determining which model to use.

Staff's second witness on the weather normal, Regulatory Economist James Gray, testified that estimates of weather-normalized, peak-day demands are important because they determine the relative contributions of each service class, which is then used to determine the cost of service. Finally, Staff's third witness on this issue,

Regulatory Economist Henry Warren, produced calculations pertaining to the small general service class of MGE's customers.

Thus, the Commission was presented with conflicting evidence as to the purpose of using the weather normal (i.e., accurate weather prediction versus a comparison of what is "normal") and how the weather normal should be determined. "[I]f substantial evidence supports either of two conflicting factual conclusions, '[we are] bound by the findings of the administrative tribunal.'" *AG Processing, Inc.*, 120 S.W.3d at 735 (quoting *Amway Corp.*, 794 S.W.2d at 668). The determination of witness credibility is a subject best left to the Commission, "'which is free to believe none, part, or all of [a witness's] testimony.'" *Mo. Gas Energy*, 186 S.W.3d at 382 (quoting *Commerce Bank*, *N.A.*, 141 S.W.3d at 456–57 n. 19). We will not reweigh the evidence presented to the Commission. *Assoc. Natural Gas Co.*, 706 S.W.2d at 874. Southern Union's first point is denied.

## II. Use of Southern Union's Actual Capital Structure is Lawful and Reasonable

In its second point, Southern Union contends that the Commission's use of its actual capital structure to calculate MGE's cost of capital renders the Order unlawful, unjust, and unreasonable because MGE has no identifiable capital structure of its own and Southern Union's capital structure does not accurately reflect the makeup of MGE. As such, Southern Union claims that a hypothetical structure is necessary to ensure that MGE's capital costs are equivalent to a similarly situated local distribution company. Southern Union also argues that the use of its actual capital structure is "backward-looking," and

creates a rate of return that is unlawfully confiscatory and unreasonable.

The cost of capital—the amount a utility must pay to secure financing from shareholders—"is essentially the equivalent of fair rate of return." *Assoc. Natural Gas Co.*, 706 S.W.2d at 875. In determining the rate of return, a straightforward mathematical calculation is computed, factoring in "(i) the ratio of debt and equity to total capital, and (ii) the cost and (iii) weighted costs for each of these capital components." *Id.* These input components, however, "are not a matter of 'precise science,' because inferences must be made about the cost of equity, which involves an estimation of investor expectations." *Mo. Gas Energy*, 186 S.W.3d at 383. Some degree of speculation is a necessary element of any ratemaking decision to the extent that the decision deals with capital structure, "because such decisions are forward-looking and rely, in part, on the accuracy of financial and market forecasts." *Id.*

Generally, a rate of return is considered fair if it "covers utility operating expenses, debt service, and dividends, if it compensates investors for the risks of investment, and if it is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *Assoc. Natural Gas Co.*, 706 S.W.2d at 875 (citation and internal quotations omitted). Nonetheless, "[t]he rate of return should not be higher than is necessary to achieve these goals. Otherwise, utility customers will pay excessive prices, something regulation seeks to prohibit." *Id.* at 873. Simply put, "the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests." *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944). There is no law requiring that a utility realize a particular return, and past

losses are not part of the equation in evaluating whether a new rate is confiscatory. *State ex rel. Capital City Water Co. v. Pub. Serv. Comm'n,* 298 Mo. 524, 252 S.W. 446, 449, 456 (1922).

"All else being equal, a capital structure that includes a low percentage of equity and a large percentage of debt will be less costly, resulting in a lower rate of return, and consequently a lower revenue requirement and lower rates to customers." *Mo. Gas Energy,* 186 S.W.3d at 383 (internal quotations omitted). This occurs because the cost of debt—what it costs an organization to borrow money and pay interest— is generally less than the cost of equity, i.e., issuing stock and paying dividends or a return on investment. *Assoc. Natural Gas Co.,* 706 S.W.2d at 876.

Along a similar vein, "a company with a capital structure that includes a high percentage of debt is more risky for shareholders [who] will consequently demand a higher rate of return to compensate them for the increased risk caused by the high level of debt." *Mo. Gas Energy,* 186 S.W.3d at 383 (internal quotations omitted). Essentially, the corporation's shareholders are subordinate to its creditors, and face a greater financial risk in the event of failure than they would otherwise face in an entity with less debt. *Id.* "The more equity there is in a company's capital structure, the higher the rate of return and the more attractive a company is as an investment, because a high rate of return imposes higher costs on customers, thus increasing a company's cash flow." *Id.* When the rate of return becomes too high, however, customers begin to default, an occurrence counter to investor interests. *Id.* Thus, the Supreme Court's articulation in *Hope Natural Gas Co.* holds true: a balance between consumer and investor interests is necessary.

As discussed *supra,* this Court employs a two-pronged standard of review. First, we determine if the Commission's decision was lawful; second, we ensure that its decision was reasonable and supported by competent and substantial evidence. *Mo. Gas Energy,* 186 S.W.3d at 381 (citing *Friendship Village,* 907 S.W.2d at 344). Southern Union challenges both prongs with regard to capital structure.

### (a) The Order as Related to Capital Structure is Lawful

 The issue of lawfulness can be characterized as whether the Commission had the statutory authority to make the decision it made. *Friendship Village,* 907 S.W.2d at 348. There is no question that the Commission had the statutory authority to rule on the propriety of the proposed tariffs in this case, as the Western District of this Court previously found.

> Section 393.150 gives the Commission the authority to conduct a hearing regarding the propriety of new rates filed by any gas corporation and to make a decision regarding those rates. Section 393.150.2 places the burden of proving that an increased rate is just and reasonable on the public utility. And all charges made or demanded "shall be just and reasonable and not more than allowed by law." § 393.130.1. Section 393.270.4 requires the Commission to give due regard, in determining the price to be charged for gas, "to a reasonable average return upon capital actually expended," among other matters. The question of lawfulness-here, whether the Commission had the authority to rule on the propriety of MGE's tariffs-is clearly established by statute.

*Mo. Gas Energy,* 186 S.W.3d at 384. Furthermore, the findings of fact and conclusions of law—discussed *infra*—are sufficient, making the Order lawful in this re-

gard, as well. *See AT & T Commc'ns of the Sw., Inc. v. Pub. Serv. Comm'n,* 62 S.W.3d 545, 548 (Mo.App.2001). Finally, nothing in Southern Union's point relied on expressly challenges the Commission's interpretation of the law or legal authority to consider a capital structure, either actual or hypothetical, in establishing the tariff. The Order as related to capital structure is lawful.

### (b) The Order as Related to Capital Structure is Just and Reasonable

■ The United States Supreme Court first created a standard for the justness and reasonableness of rates in *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.

*Bluefield Waterworks & Improvement Co.,* 262 U.S. at 692–93, 43 S.Ct. 675.

The Court refined this standard in *Hope Natural Gas Co.,* stating that public utility commissions are "not bound to the use of any single formula or combination of formulae in determining rates," and that rate-making "involves the making of 'pragmatic adjustments.'" *Hope Natural Gas Co.,* 320 U.S. at 602, 64 S.Ct. 281 (citation omitted). Moreover, the Court found that under this just and reasonable analysis, "it is the result reached not the method employed which is controlling." *Id.* "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." *Id.*

Southern Union recommended to the Commission a hypothetical capital structure based on a composite of various local distribution companies it determined were comparable to MGE. Southern Union's recommended ratios of capital components to total capital were 46% common equity, 44.09% long-term debt, and 9.91% short-term debt. Factoring in the costs and weighted costs of these capital components, Southern Union proposed a return on equity of 11.95%. Southern Union thus seeks to use a capital structure in line with the national average of local distribution companies, but with a higher return on equity to reflect MGE's small size and lack of protection from "the vagaries of weath-

er."[10] Absent the adoption of its proposed hypothetical capital structure, Southern Union stated its willingness to use Southern Union's actual capital structure as of October 31, 2006.

Staff argued for the use of Southern Union's actual capital structure as of October 31, 2006. This consisted of 36.06% common equity, 55.92% long-term debt, 4.71% preferred stock, and 3.3% short-term debt. Staff recommended a return on equity between 8.65% and 9.25%.

Although OPC did not take a position on capital structure and did not offer any direct testimony on the issue of capital structure and return on equity, its rebuttal witness Russell Trippensee recommended a return on equity between 7.70% and 8.65%. Trippensee's rationale for the lower rate was based on the premise that the SFV rate design virtually eliminates much of the risk associated with earnings variability.

Ultimately, the Commission adopted Staff's recommended capital structure, but increased the value recommended by Staff for return on equity to 10.5%, the same rate adopted during the previous rate case. *See Mo. Gas Energy*, 186 S.W.3d at 386.

In its Order, the Commission acknowledged that MGE, as an operating division of Southern Union, has no identifiable capital structure separate and distinct from that of Southern Union. Following a general description of the parties' positions and of capital structure in general, it then adopted its reasoning from the previous rate case, in which Southern Union proposed a similar hypothetical capital structure for MGE, and the Commission instead used Southern Union's actual capital structure. The Commission emphasized that

"the capital structure of Southern Union is the result of its management decisions."

Although in the current case Southern Union discusses, at length, its transition away from the utility sector and toward that of the "middleman," such a transformation—and the resulting change in make-up and risk—does not automatically make the Court's reasoning in the previous rate case irrelevant. The notion that "[r]atepayers ... are captive customers[,]" *Mo. Gas Energy*, 186 S.W.3d at 387, remains unchanged. Likewise, and conversely, investors and potential investors still have freedom to move in the marketplace. As noted in the previous rate case, "the company's high debt level [is] the result of explicit management decisions to maximize investors' wealth," and while "[i]t does result in extra risks for the company, ... if shareholders don't like that, they can sell their shares." *Id.* "Investors do not look at capital structures used by regulatory authorities when making investment decisions; investment concerns are instead driven by what the rates ultimately do to a company's revenue stream." *Id.* Southern Union cannot escape the fact that, as an operating division of Southern Union without its own discernable capital structure, MGE *is* Southern Union; it is bound by the decisions of Southern Union's management, and potential investors desiring to invest in MGE must do so by investing in Southern Union, undertaking all of the risks and receiving all of the benefits associated with that investment.

Notwithstanding that it is the ultimate results of the Commission's decision that must be reasonable, and this outcome no doubt falls into the reasonable category, *see Hope Natural Gas Co.*, 320 U.S. at 602, 64 S.Ct. 281, there was substantial and

10. According to Southern Union's expert on this issue, the average common equity percentage for the relevant time period was 46.91%, with an average return on equity of 10.66%.

competent evidence presented on both sides of this issue, and the Commission was free to believe all, some, or none of that evidence. *Commerce Bank, N.A.*, 141 S.W.3d at 456–57 n. 19. "[I]f substantial evidence supports either of two conflicting factual conclusions, '[this Court is] bound by the findings of the administrative tribunal.'" *AG Processing, Inc.*, 120 S.W.3d at 735 (quoting *Amway Corp.*, 794 S.W.2d at 668).

Further, Southern Union's implied contention that a hypothetical capital structure was mandated in this case is a misstatement of case law. Although the Western District of this Court has determined two distinct instances when it is permissible to disregard an entity's actual capital structure in favor of a hypothetical one—"when the utility's actual debt-equity ratio is deemed inefficient and unreasonable because it contains too much equity and not enough debt, necessitating an inflated rate of return[,]" and "when the utility is part of a holding company system"—the language the Court uses makes clear that the decision to use a hypothetical capital structure is one within the Commission's discretion. *Assoc. Natural Gas Co.*, 706 S.W.2d at 878. The Court expressly states that "[t]here are two circumstances in which a utility commission *might* disregard a utility's actual capital structure and adopt a hypothetical capital structure for ratemaking purposes." *Id.* (emphasis added). Moreover, the Court acknowledges that "[section 393.150] neither prescribes nor limits the methodology that the Commission may use in determining rates. The complexities inherent in a rate of return determination necessarily require that the Commission be granted considerable discretion." *Id.* at 880 (citing *United Tel. Co. of Iowa v. Iowa State Commerce Comm'n*, 257 N.W.2d 466, 480 (Iowa 1977)). The Commission's decision in this case to use Southern Union's actual capital structure and not a hypothetical one is an appropriate exercise of that discretion. Southern Union cites no cases where using an applicant's actual capital structure for ratemaking purposes has been held an abuse of discretion. Southern Union's second point is denied.

## III. Treatment of Panhandle's Debt is Lawful and Reasonable

■ Southern Union's final point challenges the Commission's decision to include the debt of one of its subsidiaries, Panhandle, for the purpose of calculating the percentage of long-term debt present in Southern Union's capital structure, but to exclude that same debt from calculations of the cost of the company's long-term debt. Southern Union claims that such piecemeal treatment of Panhandle's debt unfairly lowers its equity ratio and creates a confiscatory rate.

As discussed *supra*, the Commission acted within its statutory authority to consider Southern Union's capital structure in ruling on the propriety of its proposed rates. *See Friendship Village*, 907 S.W.2d at 348. Thus, the Order is lawful.

The same standard of reasonableness set forth by the United States Supreme Court in *Hope Natural Gas Co.* and *Bluefield Waterworks & Improvement Co.*, set out *supra*, applies to this issue, as does the degree of latitude given the Commission in its determination and calculation of the appropriate capital structure. Moreover, under this just and reasonable analysis, "it is [still] the result reached not the method employed which is controlling." *Hope Natural Gas Co.*, 320 U.S. at 602, 64 S.Ct. 281. Just as using Southern Union's actual capital structure yields a reasonable result, so does selectively including Panhandle's debt.

As noted by the Commission in the preceding rate case,

[Panhandle's] debt is the debt of a subsidiary company and is not the debt of Southern Union. That debt was raised by [Panhandle] for its own purposes and is rated separately by the rating agencies. Furthermore, that debt is non-recourse to Southern Union. That means that the debt restricts the assets that the debt[-]holders can use to satisfy the debt. In other words, if [Panhandle] were to default on its debt, the debt[-]holders would not be able to seize the assets of Southern Union to collect the debt.

Southern Union's decision to acquire Panhandle as a subsidiary company and its accompanying debt structure, however, regardless of the ability of Pan handle's creditors to seize Southern Union assets, affects Southern Union, its shareholders, and potential investors. Thus, its inclusion in the Commission's calculation of the percentage of long-term debt in the capital structure of Southern Union makes sense. It is an accurate reflection of Southern Union's decision to operate under a debt-heavy capital structure.

Because Southern Union—and, therefore, MGE—is not liable for any of Pan handle's debt, however, it is similarly reasonable to exclude that debt from the calculation of the actual cost of Southern Union's—and, therefore, MGE's—long-term debt. In other words, although the Panhandle debt exists under the umbrella of Southern Union, the actual cost of that debt to Southern Union and, therefore, to MGE is zero.

Moreover, Southern Union neglects to expound upon its blanket statement that the selective inclusion of Panhandle's debt renders the Order unlawful and unreasonable. It simply restates its initial contention four times, separated only by the above block quote from the 2004 Order. Southern Union similarly fails to include any case law or other persuasive authority directing this Court as to how the Commission's calculations are incorrect or unreasonable. Given that the Commission has such broad discretion in calculating the rate of return, and without guidance from Southern Union—whose burden it is to demonstrate the invalidity of the Commission's decision—as to how the Commission has abused that discretion, this Court is unable to say that the Commission's action was unreasonable or an abuse of discretion. Again, "it is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." *Hope Natural Gas Co.,* 320 U.S. at 602, 64 S.Ct. 281. Southern Union's final point is denied.

### *Decision*

The Commission's Order is affirmed.

BURRELL, P.J., and PARRISH, J., concur.