**AMWAY CORPORATION, INC., Respondent,**

v.

**DIRECTOR OF REVENUE, Appellant.**

**No. 72155.**

Supreme Court of Missouri, En Banc.

July 31, 1990.

As Modified on Denial of Rehearing Sept. 11, 1990.

William L. Webster, Atty. Gen., Richard L. Wieler, Asst. Atty. Gen., George Cox, Sp. Asst. Atty. Gen., Jefferson City, for appellant.

Lawrence H. Weltman, Lori W. Jones, St. Louis, for respondent.

HOLSTEIN, Judge.

The Director of Revenue of Missouri (Director) appeals from an order of the Administrative Hearing Commission (AHC) denying the Director's assessment of income tax, interest and penalties against Amway Corporation, Inc. (Amway) for the fiscal years ending August 31 in 1978, 1979 and 1980. The questions presented are whether 15 U.S.C. § 381 or the United States Constitution prohibit Missouri from imposing an apportioned net income tax on Amway. Reversed.

Decisions of the AHC are to be upheld when authorized by law and supported by competent and substantial evidence upon the whole record. § 621.193, RSMo 1986; *Unitog Rental Serv. v. Director of Revenue*, 779 S.W.2d 568, 569 (Mo. banc 1989).

██ Amway is a Michigan-based corporation which engages in the manufacture and sale of household products, food supplements, commercial products, and general catalog merchandise. The products are marketed through Amway distributors. At the outset an issue arises as to whether Amway engaged in the sale of distributorships.

██ Relying on the testimony of Randall R. Preston, an Amway vice-president, and on language in the applications to become a distributor and to renew the distributorship, Amway asserts that the only fees paid were for the purchase of a sales kit and a monthly publication for distributors and no fee was paid to Amway to become a distributor or renew a distributorship. However, Amway has overlooked evidence and reasonable inferences from the evidence which do not support its view. In addition, it has overlooked the AHC's Findings of Fact which, if supported by substantial evidence, are binding here. When substantial evidence supports either of two conflicting factual conclusions, this Court is bound by the findings of the administrative tribunal. *Prokopf v. Whaley*, 592 S.W.2d 819, 822–23 (Mo. banc 1980).

In addition to the testimony relied on by Amway, the following appears in the testimony of Randall Preston:

COMMISSIONER SPINDEN: ... In the years '78, '79 and '80, did would[-]be distributors pay some consideration to Amway Corporation—
THE WITNESS: Yes, sir.
COMMISSIONER SPINDEN: —with the application?
THE WITNESS: Yes, sir.

. . . .

Q [BY AMWAY'S COUNSEL]: How much would a person have paid to become an Amway distributor?
COMMISSIONER SPINDEN: '78, '79 and '80.
THE WITNESS: Less than $40 or $50, your Honor.

. . . .

Q [BY COUNSEL FOR AMWAY]: ... When a person wants to become an Amway distributor and he pays this $40 or $50, to whom does he pay it? Does he pay it to Amway Corporation or does he pay it to the distributor?
A: He pays it to his sponsor.
Q: So the sponsor receives the money, not Amway Corporation?
A: Ultimately it is remitted to Amway Corporation.

Amway also entered into a stipulation of facts that included the following recital:

To maintain distributor status, a distributor submitted an annual notice of intent to renew distributorship ... and paid a nominal renewal fee. . . .

The findings of fact of the AHC are not objected to by Amway. Nothing in the findings of fact suggests that fees were paid only for the purchase of sales kits and monthly publications. On the contrary, the findings include the following statements:

New distributors completed and signed application forms and paid fees to become distributors.

. . . .

[Amway] motivated its distributors to recruit new distributors by letting them share the profits generated by new distributors. [Amway] entered into separate and independent contractual relationships with each distributor.

. . . .

[Amway] required distributors to renew annually their distributors' authorization by completing Notice of Intent forms and mailing them with checks or money orders for $4.25 ($10.25 in the case of warehouse ordering distributors).

The findings of fact are supported by substantial evidence. In addition, twice in the conclusions of law the AHC refers to the transactions as the "sales of distributorships."

Amway characterizes each distributor to be a self-employed, independent businessman who purchases Amway's products at wholesale prices and resells those products for a profit. The application for distributorship states that there is no employment or agency relationship existing between Amway and any distributor and precludes distributors from holding themselves out to third parties as legal representatives, agents or employees of Amway.

Amway's primary customers are designated as direct distributors. At a price set by Amway, the direct distributors purchase most products in bulk on a cash basis in order to resell them to other distributors or to the ultimate consumers. However, catalog items may be purchased directly from Amway by all distributors. Once the products are initially sold by Amway, they have the potential to be resold from distributor to distributor several times before reaching the ultimate consumer. The price and terms of sale are set at the distributor's discretion subject only to the prohibition of sales in retail stores. Specific sales techniques are left to each distributor, although certain techniques are discouraged by the "Amway Code of Ethics." Each distributor also agrees that he or she will "comply with the Amway Sales and Marketing Plan as set forth in the official Amway literature." The sales and marketing plan authorizes one holding a distributorship not only to sell Amway products, but to sponsor other distributors. Through the incentives of the right to sell products to sponsored distributors, volume bonuses, and the potential of becoming a direct distributor, Amway enthusiastically encourages its distributors to solicit the sale of Amway distributorships in Missouri. Even though a "sponsor" distributor solicits the sale of distributorships, the distributorships are a direct agreement between Amway and the new distributor. All proceeds from the sale of the distributorships go to Amway.

Following an audit by the Multi–State Tax Commission, the Director assessed a state income tax deficiency against Amway for fiscal years ending in 1978, 1979 and 1980. The assessments were based upon the Director's position that Amway's activities in Missouri had exceeded the minimum standards of 15 U.S.C. § 381, which provides a limitation on a state's authority to impose a net income tax. Amway appealed. The AHC found the assessment was erroneous. Now the Director appeals.

■ The relevant portion of 15 U.S.C. § 381, entitled "Imposition of net income tax," provides:

(a) No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:

(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and

(2) the solicitation of orders by such person, or his representative, in such

State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

This Court has interpreted 15 U.S.C. § 381 in *CIBA Pharmaceutical Products, Inc., v. State Tax Comm'n*, 382 S.W.2d 645 (Mo. banc 1964). In that case, the State Tax Commission appealed the circuit court's decisions reversing the Director of Revenue's assessment of state income tax against CIBA Pharmaceutical. CIBA Pharmaceutical was a New Jersey corporation in the business of manufacturing and selling drug products throughout the United States, including Missouri. CIBA employed Missouri residents as full-time sales representatives to solicit orders from druggists and wholesale pharmaceutical companies located in Missouri. The orders were filled out by the representatives and sent to CIBA's home office in New Jersey for approval. If an order was approved, then it was completed by shipping the goods into Missouri from an out-of-state location. CIBA supplied the Missouri sales representatives with automobiles and reimbursed their expenses. No sales office or warehouses were located in Missouri. Educational sales meetings were held periodically in St. Louis, Missouri, to distribute information on particular products and to instruct salesmen on company policy. Additionally, CIBA sales representatives would also visit hospitals, pharmacists and doctors located in their sales territory and distribute literature along with samples of CIBA products. The Court concluded that the facts failed to show that CIBA was engaged in intrastate commerce, and its activities in Missouri did not equal or exceed the standards set by 15 U.S.C. § 381, which sets the minimum standards for imposition of state income tax on income derived from interstate commerce. *Id.* at 653.

Amway's brief points out that its activity in Missouri is far less than existed in *CIBA*. However, it is not the quantity of activity that determines whether the federal statute is a shield against state income tax liability. The statutory prohibition on taxation is determined by the quality of the activity; specifically, activity which is limited to the solicitation of the sale of tangible personal property. In *CIBA*, the only activity of the taxpayer was designed to produce sales of pharmaceuticals, and the pharmaceuticals were the only thing actually sold. Pharmaceuticals are unquestionably tangible personal property.

By contrast, intangible personal property is property having no intrinsic and marketable value, but is merely the representation or evidence of value, such as a certificate of stock, promissory note or franchise. *Black's Law Dictionary* 726 (5th ed. 1979). The word "franchise" may be defined in a limited sense in a specific application.[1] But in the generic sense, a franchise is the license from the owner of a trademark or trade name permitting another to sell a product under that trade name or permitting another to sell a product or service under the mark. *Black's Law Dictionary* 592 (5th ed.1979).

The distributorships were a license sold for a fee by Amway for "the right to service ... customers and sponsor ... distributors." The sale of such a right constitutes a nonexclusive franchise under the definition set forth above. The sale of a nonexclusive franchise is, in turn, a sale of intangible personal property.

■ The next question is whether Amway or its representatives solicited the sale of the distributorships. Amway argues that because distributors are independent business people and are not employees, the solicitation of the sale of distributorships is not done by Amway representatives. Part and parcel of Amway's marketing plan was that distributors were authorized to solicit the sale of new Amway distributorships. Amway and the new distributor were the only parties to the distributorship agree-

---

**1.** For example, see § 407.815(2), defining motor vehicle franchises, and § 407.400(1), defining pyramid scheme franchises.

ment. All the proceeds of the sales of the distributorships went to Amway. One may be a representative or agent for the limited purpose of soliciting sales without being an employee and without having the legal authority to enter into contracts on behalf of another. In the statutory context, the plain meaning of "representative" is simply one acting in the place of another. *Webster's Third New International Dictionary* 1926 (unabr. ed. 1966). Notwithstanding the disclaimer of agency in the application, Amway's distributors were clearly authorized to act on behalf of Amway in soliciting the sale of distributorships. In doing so, they were Amway's representatives.

The AHC referred to the transactions as the sales of distributorships. However, it characterized the sale of distributorships as "a device intended to spur product sales" and therefore such activity falls "under the rubric of solicitation." *See United States Tobacco Co. v. Commonwealth*, 478 Pa. 125, 139, 386 A.2d 471, 478 (1978), *cert. denied*, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). Doubtless the sale of distributorships spurred product sales, but it also generated significant income for Amway independent of the sale of any tangible products. Even if no products had been sold by its distributors, Amway enjoyed income from the sale or renewal of each distributorship. During the audit period, the distributors paid a minimum renewal fee of approximately $5.00 each. By 1980, the last year involved, there were over 35,000 Missouri distributors. The minimum income for that year would have exceeded $175,000.00. The solicitation of the sale of distributorships was not an isolated or transient event, but an ongoing source of income separate from the sale of products or merchandise.

Nevertheless, the volume of sales is not the key to deciding whether 15 U.S.C. § 381 shields Amway from Missouri income tax. The shield is only available so long as Amway and its representatives did no more than solicit the sale of tangible personal property. Even though the activity may have been secondary to spurring product sales, the shield evaporated when

Amway, through its distributors, solicited the sale of the distributorships.

A second basis asserted for denying Missouri's authority to impose its net income tax is that the tax is a violation of the Fourteenth Amendment Due Process Clause of the United States Constitution. Amway claims it lacks a sufficient connection with Missouri to form the "substantial nexus" required by due process.

The particular tax complained of is imposed by § 143.071, RSMo 1986, on "Missouri taxable income," which is further described as "so much of [the corporate] federal income tax taxable income ... as is derived from sources within Missouri." § 143.431.1, RSMo 1986. The tax is determined based upon the apportionment formula found in § 143.451, RSMo 1986 or, at the taxpayer's option, the formula expressed in the Multi–State Tax Compact, § 32.200, art. III and IV, RSMo 1986.

 Net income from interstate operations of a foreign corporation may be taxed by a state if the levy is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by the state. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977); *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 464–65, 79 S.Ct. 357, 365–66, 3 L.Ed.2d 421 (1959). The constitutional restrictions on the State's authority to tax are quite limited. Indeed, 15 U.S.C. § 381 was a congressional reaction to expansive authority granted in *Northwestern States Portland Cement Co.* permitting states to impose apportioned net income taxes on foreign corporations. *Heublein v. South Carolina State Tax Comm'n*, 409 U.S. 275, 281, 93 S.Ct. 483, 487–88, 34 L.Ed.2d 472 (1972).

 There are really two nexus requirements: first, there must be a connection between the taxpayer and the taxing state; second, the out-of-state income sought to be taxed must bear a sufficient relationship through the taxpayer to the

taxing state. *James v. Int'l Tel. & Tel. Corp.*, 654 S.W.2d 865, 868 (Mo. banc 1983). The first nexus requirement is met if the taxpayer avails itself of the substantial privilege of doing business in the state and the second is met if the intrastate and extrastate activities form part of a unitary business. *Id.*

There is no question but that Amway's sales of goods and distributorships in and outside of Missouri are part of a unitary business. The "nexus" question remaining is "whether the state has given anything for which it can ask in return." *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940). Because state government participates in promoting commercial activity, providing a trained work force and delivering other advantages of civilization, a corporation engaging in commercial activity in a state may properly be made to bear a just share of the state's tax burden. *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 626–27, 101 S.Ct. 2946, 2958–59, 69 L.Ed.2d 884 (1981).

At the crux of Amway's argument is the claim that Amway had no property, no offices and no employees in Missouri. We have already pointed out that characterizing Amway's distributors as independent businessmen did not negate the fact that those soliciting the sales of distributorships in Missouri were acting on behalf of and with the full authority of Amway. Whether the corporation's activities are done through employees or non-employees who have authority to solicit business on a corporation's behalf, it has availed itself of the substantial benefits of engaging in a commercial activity in a state for which the corporation may be subject to a state income tax "unembarrassed by the Constitution." *Wisconsin v. J.C. Penney Co.*, 311 U.S. at 444, 61 S.Ct. at 249–50.

The AHC erred in its conclusion that because Amway engaged only in the solicitation of the sale of tangible personal property, it was protected from an apportioned net income tax by the provisions of 15 U.S.C. § 381. In addition, the assessment does not violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Accordingly, the decision of the AHC is reversed.

Amway claims it is protected from the taxes sought to be assessed on grounds other than 15 U.S.C. § 381 and the constitutional claims. Allegedly, those grounds were asserted before the AHC but not addressed in its decision. Assuming undecided issues remain, there may be a need to make additional findings of fact and conclusions of law. However, there does not appear to be any necessity to reopen the record for additional evidence. On remand the AHC may make the additional factual findings and conclusions of law necessary to resolve undecided factual and legal issues. The AHC shall then enter such decision as is consistent with the facts and law.

All concur.