

# In the
# Missouri Court of Appeals
## Western District

IN THE MATTER OF THE )
APPLICATION OF EVERGY )
MISSOURI WEST INC D/B/A ) WD85958
EVERGY MISSOURI WEST FOR )
A FINANCING ORDER ) OPINION FILED:
AUTHORIZING THE FINANCING ) September 26, 2023
OF EXTRAORDINARY STORM )
COSTS THROUGH AN ISSUANCE )
OF SECURITIZED UTILITY )
TARIFF BONDS, MISSOURI )
PUBLIC SERVICE COMMISSION, )
 )
　　　Respondent; )
 )
EVERGY MISSOURI WEST INC., )
 )
　　　Respondent, )
 )
v. )
 )
OFFICE OF PUBLIC COUNSEL, )
 )
　　　Appellant. )

**Appeal from the Public Service Commission**

Before Division Four:  Gary D. Witt, Chief Judge, Presiding, Cynthia L. Martin, Judge, and Chad Gaddie, Special Judge

The Office of the Public Counsel ("OPC") appeals from an Amended Report and

Order issued by the Public Service Commission of the State of Missouri ("PSC") on

November 17, 2022, which granted Evergy Missouri West, Inc. d/b/a Evergy Missouri

West ("Evergy West") the authority pursuant to section 393.1700[1] to issue securitized utility tariff bonds to recover extraordinary costs associated with a winter storm. OPC argues that the PSC's calculation of qualified extraordinary costs that could be securitized is unreasonable because: (i) the extraordinary costs should have been offset by a tax deduction Evergy West received; (ii) carrying costs should have been calculated using a short-term debt rate instead of a long-term debt rate; and (iii) the wrong discount rate was used to analyze the net present value of recovery through securitization. OPC also complains that the PSC's Amended Report and Order is unlawful because it failed to sufficiently describe a statutorily required reconciliation process.

Finding no error, we affirm.

### Factual and Procedural Background[2]

*The Securitization Law*

In 2021, the Missouri General Assembly enacted section 393.1700 (the "Securitization Law"), effective August 28, 2021. The Securitization Law is a complex, technical, and lengthy statute that contemplates a sophisticated financial transaction. The Securitization Law permits electrical corporations to petition the PSC for permission to recover unusual costs, known as "securitized utility tariff costs," through the issuance of securitized bonds if approved in a PSC-issued financing order. "Securitized utility tariff

---

[1]All statutory references are to RSMo Supp. 2021 unless further noted.
[2]The salient facts are largely uncontested by OPC, and are drawn from factual findings set forth in the PSC's Amended Report and Order.

2

costs" are defined by section 393.1700.1(17) as "either energy transition costs[3] or

qualified extraordinary costs as the case may be."  This case involves use of the

Securitization Law to recover "qualified extraordinary costs."

Section 393.1700.1(13) defines "qualified extraordinary costs" as:

> costs incurred prudently before, on, or after August 28, 2021, of an extraordinary nature which would cause extreme customer rate impacts if reflected in retail customer rates recovered through customary ratemaking, such as but not limited to those related to purchases of fuel or power, inclusive of carrying charges, during anomalous weather events.

To permit recovery of qualified extraordinary costs through the issuance of securitized

bonds, the PSC must issue a financing order.  Section 393.1700.1(9) defines "financing

order" as:

> an order from the commission that authorizes the issuance of *securitized utility tariff bonds*; the imposition, collection, and periodic adjustments of a *securitized utility tariff charge*; the creation of *securitized utility tariff property*; and the sale, assignment, or transfer of securitized utility tariff property to an *assignee*.

(Emphasis added.)  "Securitized utility tariff bonds" is defined in pertinent part by section

393.1700.1(15) as:

> . . . evidence[] of indebtedness or ownership . . . issued by an electrical corporation or an *assignee* pursuant to a *financing order*, the proceeds of which are used directly or indirectly to recover, finance, or refinance commission-approved *securitized utility tariff costs and financing costs*, and that are secured by or payable from *securitized utility tariff property*.

---

[3]The Securitization Law also authorizes the issuance of securitized bonds to recover energy transition costs, defined by section 393.1700.1(7) as incurred in connection with the retirement or abandonment of an electric generating facility.  The recovery of energy transition costs through the issuance of securitized bonds is not at issue in this case.

(Emphasis added.)  "Financing costs" is defined by section 393.1700.1(8) to include a multitude of costs, fees, taxes, and charges incurred in connection with the upfront issuance of securitized utility tariff bonds or during the lifespan of the bonds.  The proceeds of the securitized utility tariff bonds are secured by or payable from "securitized utility tariff property," defined by section 393.1700.1(18)(a) to include:

> All rights and interests of an electrical corporation . . . under a ***financing order***, including the right to impose, bill, charge, collect, and receive ***securitized utility tariff charges*** authorized under the financing order . . . .

(Emphasis added.)  "Securitized utility tariff charge" is defined by section 393.1700.1(16) in pertinent part as:

> the amounts authorized by the commission to repay, finance, or refinance ***securitized utility tariff costs*** and ***financing costs*** and that are, except as otherwise provided for in this section, nonbypassable charges imposed on and part of all retail customer bills, collected . . . full, separate and apart from the electrical corporation's base rates . . . .

> Authorized securitized utility tariff bonds can be issued by an electrical

corporation or its "assignee," defined in pertinent part by section 393.1700.1(2) as:

> a legally recognized entity to which an electrical corporation assigns, sells, or transfers, other than as security, all or a portion of its interest in or right to securitized utility tariff property.

> Simplified, the Securitization Law allows an electrical corporation to seek

approval from the PSC to issue a financing order that authorizes the electrical corporation or its assignee to issue bonds.  The bonds are in the amount of the electrical corporation's qualified extraordinary costs (or energy transition costs) and approved financing costs the electrical corporation elects to include in its request.  Upon the sale of the bonds, the electrical corporation will immediately recover its qualified extraordinary costs (or

4

energy transition costs). Then, the electrical corporation's customers are assessed a tariff charge on their utility bills over the lifespan of the bonds that is in an amount sufficient to pay the principal and interest on the bonds, and anticipated ongoing financing costs, over the lifespan of the bonds. The revenue stream represented by the tariff charges is the primary property that securitizes the bonds.

The option of financing qualified extraordinary costs through the issuance of securitized utility tariff bonds is intended to benefit customers by affording an electrical corporation an option for recovery of the costs other than through its base rates, a fuel adjustment clause ("FAC"), or a deferred accounting authority order ("AAO"). In theory, securitization of extraordinary costs incurred during an anomalous weather event should save utility customers money or be otherwise advantageous to utility customers because the interest rate paid on securitized bonds is lower that the interest rate that would be applied to a utility's carrying costs if recovered through customary ratemaking; because an AAO would simply defer the extraordinary costs for consideration in a future rate case; and because an FAC requires recovery of costs from utility customers over a twelve-month period, whereas securitized bonds permit the recovery of costs from utility customers over the lifespan of the bonds which is generally several years.

*Evergy West's Petition Pursuant to the Securitization Law*

In February 2021, a severe winter storm known as Winter Storm Uri caused sub-zero temperatures, snow and ice, and high winds in Missouri over an eight-day period. As a result, the price of natural gas spiked. The spike in natural gas prices resulted in record high real-time electricity prices for Southwest Power Pool, Inc., of which Evergy

5

West is a member. Evergy West incurred approximately $11.8 million in fuel costs and $314.6 million in purchased power costs during Winter Storm Uri. After adjustments for transmission costs, disallowances, and off-system sales revenue, Evergy West's total energy costs were $315 million, an amount that was approximately $296.5 million greater than Evergy West's average total energy costs for the month of February.

Evergy West filed a petition pursuant to the Securitization Law on March 11, 2022, seeking a financing order from the PSC that would permit the issuance of securitized utility tariff bonds to recover extraordinary costs incurred during Winter Storm Uri. Evergy West sought authority to securitize a total of $356.7 million in qualified extraordinary costs. No party disputes that Evergy West is an electrical corporation as defined in the Securitization Law, or that Winter Storm Uri was an anomalous weather event that caused Evergy West to incur extraordinary costs.

Evergy West's petition contemplated assigning its interest in the securitized utility tariff charges that its customers would be charged to a newly created special purpose entity ("Special Purpose Entity").[4] The Special Purpose Entity would then be the issuer of the securitized utility tariff bonds authorized by the PSC's financing order.

---

[4] A Special Purpose Entity was used as the assignee because the entity would have a credit quality that is separated from that of Evergy West, permitting it to attain higher credit ratings and lower financing costs. The transaction between Evergy West and the Special Purpose Entity had to be structured as a "true sale" for bankruptcy purposes so that a bankruptcy court could not be expected to overturn the transaction and declare the securitized utility tariff property (the right to receive the securitized utility tariff charges paid by Evergy West's customers) that had been assigned to the Special Purpose Entity to be in fact owned by Evergy West in the event of a bankruptcy.

After extensive proceedings participated in by PSC staff ("Staff"), Evergy West, OPC, and other interested parties who had intervened, the PSC issued its initial report and order authorizing a financing order pursuant to the Securitization Law on October 7, 2022. Evergy West, Staff, and OPC filed timely applications for clarification and for rehearing. The PSC issued an Amended Report and Order[5] on November 17, 2022, with an effective date of November 27, 2022. OPC's application for additional clarifications was denied by the PSC. OPC timely appealed the Amended Report and Order.

The Amended Report and Order found that costs in the amount of $307,811,246[6] incurred by Evergy West "in relation to Winter Storm Uri are prudently incurred costs of an extraordinary nature that would cause extreme customer rate impacts if reflected in customer rates recovered through customary ratemaking and as such are 'qualified extraordinary costs' as defined in Section 393.1700.1(13), RSMo." The PSC found that the recovery of this amount "is just and reasonable, and in the public interest," and that Winter Storm Uri was an "anomalous weather event." The Amended Report and Order thus authorized a financing order permitting the issuance of securitized utility tariff bonds with a principal amount equal to: (i) Evergy West's qualified extraordinary costs in the amount of $307,811,246: (ii) financing costs (described in greater detail in the Amended Report and Order but estimated at approximately $6 million); and (iii) and the cost of

---

[5] The Amended Report and Order is, in effect, the financing order contemplated by the Securitization Law. Some of the parties refer to the Amended Report and Order as a Financing Order in their briefs. The documents are one in the same.

[6] This amount is made up of $280,667,566 in fuel and purchased power costs and $27,143,680 in carrying costs.

PSC advisors authorized by the Securitization Law to collaborate with Evergy West in the bond marketing process and in assisting the PSC in evaluating the reasonableness of the pricing, terms and conditions of the securitized utility tariff bonds as to ensure that securitization provides quantifiable net present value benefits to Evergy West's customers.

The Amended Report and Order identified a multitude of contested issues that were resolved in connection with Evergy West's petition. The contested issues implicated by OPC's appeal are: (i) whether the PSC's calculation of qualified extraordinary costs should have been reduced by the amount of an income tax deduction Evergy West was entitled to as a result of the increased costs it incurred due to Winter Storm Uri; (ii) whether the carrying costs for Winter Storm Uri included in the PSC's calculation of qualified extraordinary costs were properly calculated; and (iii) whether the appropriate discount rate was used to calculate the net present value of securitized utility tariff costs that would be recovered for Winter Storm Uri through securitized utility tariff bonds. In addition, OPC questions whether the Amended Report and Order complies with section 393.1700.2(3)(c)k, which requires that a financing order must specify a future ratemaking process to reconcile any differences between the actual securitized utility tariff costs financed by securitized utility tariff bonds and the final securitized utility tariff costs incurred by the electrical corporation.

Additional facts will be discussed as required in connection with our review of each of these issues.

## Standard of Review

Section 393.1700.2(3)(a)c provides that "[j]udicial review of a financing order [authorized by the Securitization Law] may be had only in accordance with sections 386.500 and 386.510." Section 386.500 addresses rehearing before the PSC and compliance with its provisions and is not at issue in this appeal. Section 386.510 provides that appeals shall be taken from PSC orders or decisions to "the appellate court with the territorial jurisdiction over the county . . . in which the [PSC] has its principal office for the purpose of having the reasonableness or lawfulness of the . . . order or decision . . . inquired into or determined." Section 386.510 further provides that "the court of appeals shall render its opinion either affirming or setting aside, in whole or in part, the order or decision of the [PSC] under review."

> The burden of proof is upon the appellant to show that the order or decision of the PSC is unlawful or unreasonable. The lawfulness of a PSC order is determined by whether statutory authority for its issuance exists, and all legal issues are reviewed *de novo*.

*State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n of Mo.*, 120 S.W.3d 732, 734 (Mo. banc 2003) (footnote omitted). "The decision of the [PSC] is reasonable where the order is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious or where the [PSC] has not abused its discretion." *State ex rel. Praxair, Inc. v. Mo. Pub. Serv. Comm'n*, 344 S.W.3d 178, 184 (Mo. banc 2011) (quoting *Environmental Utilities, LLC v. Public Service Comm'n*, 219 S.W.3d 256, 265 (Mo. App. W.D. 2007)). "The [PSC's] factual findings are presumptively correct, and if substantial evidence supports either of two conflicting factual conclusions, 'the Court is bound by the

9

findings of the administrative tribunal.'" *AG Processing*, 120 S.W.3d at 735 (quoting *Amway Corp. v. Director of Revenue*, 794 S.W.2d 666, 668 (Mo. banc 1990)). "The determination of witness credibility is left to the [PSC], which is free to believe none, part, or all of the testimony." *Spire Mo., Inc. v. Mo. Pub. Serv. Comm'n*, 607 S.W.3d 759, 765 (Mo. App. W.D. 2020) (quoting *In re Kansas City Power & Light Co.'s Request for Auth. to Implement a Gen. Rate Increase for Elec. Serv. v. Mo. Pub. Serv. Comm'n*, 509 S.W.3d 757, 764 (Mo. App. W.D. 2016)).

**Analysis**

OPC raises four points on appeal. Point one argues that the PSC's failure to reduce the calculated amount of qualified extraordinary costs by the amount of an income tax deduction available to Evergy West as a result of costs incurred in relation to Winter Storm Uri was unreasonable. Point two argues that the PSC's error in connection with point one was compounded by the fact that the Amended Report and Order failed to specify, as required by section 393.1700.2(3)(c)k, the process that would be used to reconcile any differences between the actual securitized utility tariff costs financed by securitized utility tariff bonds and the final securitized utility tariff costs incurred by Evergy West. Point three argues that the PSC's decision to use a long-term debt rate to calculate the amount of carrying costs included in the approved amount of qualified extraordinary costs was unreasonable. Point four argues that the PSC's decision to use the same discount rate to analyze recovery through securitization as would have been used to analyze recovery through customary ratemaking was unreasonable. We address the points in the order raised in OPC's opening brief.

10

**It Was Not Unreasonable for the PSC to Reject OPC's Request to Offset Qualified Extraordinary Costs that Could Be Securitized by a Tax Deduction Available to Evergy West as a Result of Costs Incurred During Winter Strom Uri (Point One)**

In its first point on appeal, OPC argues that it was unreasonable for the PSC to reject OPC's proposal to reduce the amount it found to be prudently incurred qualified extraordinary costs by a one-time tax deduction of approximately $72 million for fuel and purchased power costs Evergy West incurred in relation to Winter Storm Uri. For reasons we explain, OPC's point is without merit.

Evergy West is a member of a consolidated tax group, Evergy, Inc. Evergy West was entitled to a tax deduction when it incurred costs in relation to Winter Storm Uri. For book purposes, Evergy West did not immediately take the permitted tax deduction, creating a timing issue with respect to realization of the benefit of the deduction. Instead, Evergy West recorded deferred taxes on its books as a liability, with the intent of offsetting those taxes by the permitted tax deduction over time.

During the proceedings before the PSC, two alternatives were submitted for addressing the deferred taxes and the available tax deduction in the context of calculating qualified extraordinary costs. OPC proposed what it characterizes as "simple alternatives." First, OPC proposed offsetting (reducing) the amount of extraordinary costs that could be securitized by the available tax deduction. Second, OPC proposed including the anticipated income tax liability that will be incurred on receipt of securitized utility tariff charge revenue in the amount of the securitized utility tariff charge appearing on Evergy West's customers' bills. According to OPC, these "simple alternatives" would eliminate the need to consider Evergy West's deferred tax liability in

11

future rate cases, and would eliminate the need for Evergy West to offset securitized utility tariff charge revenues by the deferred tax liability reflected on its books.

Staff and Evergy West opposed OPC's proposals and submitted alternative proposals. Evergy West proposed flowing the benefits of its available tax deduction back to customers over time by including the deferred taxes reflected on its books in rate base until all Winter Storm Uri costs are collected through securitized financing. Rate base is independent of the securitized utility tariff charge that appears as a line item on a customer's utility bill. *See* section 393.1700.1(16). Staff agreed with this position. Staff also noted that the income tax liability that will be incurred on receipt of the revenues represented by customer-paid securitized utility tariff charges had not been included by either Staff or Evergy in calculating the amount that should be approved for securitization.[7] Staff also testified that it understood that income taxes paid on the revenue represented by securitized utility tariff charges would not be charged to Evergy West customers in future rate cases or other regulatory proceedings.

The PSC rejected the alternatives proposed by OPC and adopted the alternatives proposed by Staff and Evergy West. The Amended Report and Order includes numerous factual findings in support of the PSC's decision. We need not recount those factual

---

[7]As explained, finance costs can be included in the total amount securitized by utility tariff bonds. Section 393.1700.1(15). "Finance costs" is defined in a manner that includes taxes. *See* section 393.1700.1(8)(d), (e). However, nothing in section 393.1700 requires an electrical corporation to seek to finance through securitized bonds all finance costs that might be incurred as a part of the upfront issuance of, or in the ongoing servicing of, securitized utility tariff bonds. Staff's testimony thus underscored to the PSC that Evergy West's petition had not sought to finance future income tax liability on the revenue stream represented by the securitized utility tariff charges on customer's bills.

12

findings because none are challenged by OPC on appeal and because OPC has not argued on appeal that the factual findings fail to constitute substantial evidence on the record as a whole supporting the PSC's choice between competing alternatives. Consistent with this observation, OPC's expert witness conceded in his testimony before the PSC that either of the alternatives proposed by the parties for treatment of Evergy West's available tax deduction represented an "acceptable method." OPC has therefore failed to sustain its burden to establish that the PSC's decision to reject OPC's proposed alternatives for addressing the tax deduction available to Evergy West as a result of Winter Strom Uri was unreasonable. "The [PSC's] factual findings are presumptively correct, and if substantial evidence supports either of two conflicting factual conclusions, 'the Court is bound by the findings of the administrative tribunal.'" *AG Processing*, 120 S.W.3d at 735 (quoting *Amway Corp.*, 794 S.W.2d at 668).

OPC nonetheless argues that rejecting its proposed alternatives for reducing the amount to be securitized by the amount of the tax deduction "cannot be just and reasonable." OPC reasons that the higher the amount of securitized costs, the larger the amount of the bond issuance, resulting in more interest being incurred that must be included in the securitized utility tariff charges customers will be required to pay over the fifteen-year lifespan of the bonds. OPC relies on Exhibit 209, which was prepared by OPC's expert witness and submitted during OPC's surrebuttal testimony. Exhibit 209 used hypothetical assumptions about the amount of securitized costs with and without an offset for the tax deduction, and with and without the inclusion of anticipated income tax liability in the amount of the securitized utility tariff charge on customer's bills, to

13

demonstratively suggest that Evergy West customers would pay an additional $30 million in interest over the fifteen-year lifespan of the issued bonds if OPC's proposals were not accepted by the PSC.

Staff and Evergy West objected to the admission of Exhibit 209 in OPC's surrebuttal because their expert witnesses had no opportunity to review the exhibit, leaving the parties with no meaningful ability to challenge the assumptions in the exhibit.[8] The regulatory law judge admitted Exhibit 209 over these objections as a demonstrative exhibit for its weight as deemed appropriate. It is notable (if not dispositive) that the Amended Report and Order makes no reference to OPC's Exhibit 209 or to OPC's argument that the rejection of its proposals for addressing Evergy West's permitted tax deduction would cost customers $30 million dollars in additional interest. This suggests that no weight was afforded to Exhibit 209 by the PSC, consistent with admission of the exhibit for its weight as deemed appropriate.  It is not unreasonable that the PSC would have disregarded the demonstrative "conclusions" reflected in Exhibit 209, given the complexity of securitized financing and the absence of any meaningful opportunity for Staff or Evergy West to challenge the hypothetical assumptions relied on by OPC's expert witness in preparing the demonstrative exhibit.  It is theoretically true, as

_____

[8]Commission Rule 20 CSR 4240-2.130(7)(A)-(B) and (D) addresses pre-filed testimony in PSC proceedings, and provides in pertinent part that "(A) Direct testimony shall include all testimony and exhibits asserting and explaining that party's entire case-in-chief; (B) Where all parties file direct testimony, rebuttal testimony shall include all testimony which is responsive to the testimony and exhibits contained in any other party's direct case . . . ; . . . (D) Surrebuttal testimony shall be limited to material which is responsive to matters raised in another party's rebuttal testimony."

14

OPC argues, that the less the amount of the securitized bond issuance, the lower the amount of interest that will accrue over the lifespan of the bonds. However, it does not necessarily follow that Exhibit 209 accounted for all other assumptions or variables that would need to be considered to determine the true "cost" to customers over the lifespan of securitized utility tariff bonds of including (or not) in each customer's securitized utility tariff charge the contemplated income tax liability that would be incurred on the revenue those charges represented, or the effect of reducing qualified extraordinary costs by an available tax deduction that had not, in fact, been taken and that was intended to be used to offset deferred tax liability in order to benefit customers in future rate cases. The PSC's Amended Report and Order concluded that "there is no need to disallow an uncertain tax amount now, when more information regarding what, if any, tax benefits Evergy West receives will be available and will be reconciled in a future rate case. Accordingly, the Commission will not reduce the securitized amount for tax deductions related to Winter Storm Uri costs, or carrying costs." The PSC's resolution of competing alternatives for treatment of Evergy West's tax deduction attributable to Winter Strom Uri is not clearly contrary to the overwhelming weight of the evidence, and is a matter within the PSC's expertise as to which we will not substitute our judgment. *Spire Mo., Inc.*, 607 S.W.3d at 765 ("It is only where a [PSC] order is clearly contrary to the overwhelming weight of the evidence that we may set it aside. Additionally, with regard to issues within the [PSC's] expertise, we will not substitute our judgment for that of the [PSC]." (quoting *In re Kansas City Power & Light Co.,* 509 S.W.3d at 764)).

We are further persuaded by the fact that in explaining the decision to reject OPC's proposals, the PSC acknowledged section 393.1700.2(3)(c)k, which requires financing orders to provide for a reconciliation process to account for the difference between actual securitized utility tariff costs financed by securitized bonds and the final securitized utility tariff costs incurred by an electric corporation. The PSC found that this reconciliation process would "account for any potential tax benefits in a future rate case." OPC has not sustained its burden to establish that the PSC's calculation of qualified extraordinary costs was unreasonable because the PSC rejected OPC's proposals for addressing Evergy West's tax deduction for Winter Storm Uri costs.

Point one is denied.

**The PSC's Amended Report and Order Did Not Unlawfully Fail to Specify the Reconciliation Process Required by Section 393.1700.2(3)(c)k (Point Two)**

OPC's second point on appeal is related to its first, as OPC challenges the PSC's rejection of its proposals described in point one based in part on the fact that the reconciliation process required by section 393.1700.2(3)(c)k would sufficiently account for potential tax benefits in future rate cases. OPC alleges that the Amended Report and Order is unlawful, unreasonable, and unjust because it did not specify the reconciliation process that will be used to reconcile any differences between the actual securitized utility tariff costs financed by securitized utility tariff bonds and the final securitized utility tariff costs incurred by Evergy West as required by section 393.1700.2(3)(c)k.

Section 393.1700.2(3)(c)k provides in pertinent part as follows:

A financing order issued by the [PSC], after a hearing, to an electrical corporation shall include all of the following elements: . . . A statement

16

specifying a future ratemaking process to reconcile any differences between the actual securitized utility tariff costs financed by securitized utility tariff bonds and the final securitized utility costs incurred by the electrical corporation or assignee provided that any such reconciliation shall not affect the amount of securitized utility tariff bonds or the associated securitized utility tariff charges paid by customers . . . .

OPC concedes that the Amended Report and Order acknowledged the statutorily required reconciliation process. However, OPC complains that in doing so, the PSC "creatively reword[ed]" section 393.1700.2(3)(c)k by finding that "the Securitization Law, at Section 393.1700.2(3)(c)k . . . , requires that this Financing Order provide for a reconciliation process to account for any potential tax benefits in a future rate case," and by concluding that "[s]ection 303.1700.2(3)(c)k . . . requires that this order provide for a reconciliation process that would require Evergy West to account for any potential tax benefits that may lower its actual securitized utility tariff costs associated with Winter Storm Uri through a future rate case." OPC argues that the PSC thus committed legal error by limiting the reconciliation process required by section 393.1700.2(3)(c)(k) to accounting for potential tax benefits, when it is in fact meant to account for "any differences" between actual securitized costs financed by bonds and the final securitized costs incurred. OPC also argues that the PSC committed legal error because no details are provided about how the reconciliation process will work.

The Amended Report and Order acknowledges section 393.1700.2(3)(c)k, and thus acknowledges that the required reconciliation process will be conducted. Though the Amended Report and Order referred to the reconciliation process to explain that Evergy West's tax benefits will be accounted for in future rate cases, the Amended Report

17

and Order cannot be reasonably interpreted to limit the reconciliation process to accounting for tax benefits in future rate cases.[9]  Rather, the Amended Report and Order simply acknowledges that the required reconciliation process will be able to account for (among other things) any tax benefits in future rate cases.  We reject OPC's contention that the Amended Report and Order unlawfully expresses an intent to limit the scope of the required reconciliation process to accounting for tax benefits.

Nor do we find the Amended Report and Order to be legally insufficient in its references to the required reconciliation process.  The primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue.  *Union Elec. Co. v. Mo. Pub. Serv. Comm'n*, 591 S.W.3d 478, 485 (Mo. App. W.D. 2019).  The plain language of section 393.1700.2(3)(c)k simply requires a financing order to include a "statement specifying a future ratemaking process to reconcile any differences between the actual securitized utility tariff costs financed by securitized utility tariff bonds and the final securitized utility tariff costs incurred by the electrical corporation."  A statement in a financing order acknowledging that the amount authorized to be securitized will be subject to reconciliation in a future rate case when actual costs incurred can be confirmed is legally sufficient.  Section 393.1700.2(3)(c)k does not require a financing order to specify details about how the reconciliation process will work, a predictive undertaking that would not be feasible.

---

[9]As Staff notes in its brief, the Amended Report and Order similarly refers to the statutorily required reconciliation process in addressing resolution of a contested issue involving capital subaccounts for the Special Purpose Entity.

OPC argues that without knowing the details about how a future reconciliation process will work, it will be unable to argue for recognition of the Evergy West tax deduction in future rate cases. We disagree. The financing order's acknowledgment that reconciliation will occur, without limiting that process with prescriptive details, leaves all interested parties unencumbered in their ability to advance such arguments and evidence as they deem appropriate in future ratemaking cases to determine whether there are differences between the actual securitized utility tariff costs financed by securitized utility tariff bonds and the final securitized utility tariff costs incurred by Evergy West. Apropos of this point, Staff acknowledges in its brief that the Amended Report and Order "properly specifies a future ratemaking process to address any potential tax benefits without improperly constraining [OPC] or any party from presenting evidence and argument to be considered in the future."[10] [Staff's Brief, p. 21]

OPC has not sustained its burden to establish that the Amended Report and Order is unlawful, unreasonable, or unjust by virtue of its references to the reconciliation process required by section 393.1700.2(3)(c)k. Point two is denied.

**It Was Not Unreasonable for the PSC to Calculate Carrying Costs Included in Qualified Extraordinary Costs by Using a Long-Term Debt Rate Instead of a Short-Term Debt Rate (Point Three)**

---

[10] If reconciliation determines that there are differences between the actual securitized utility tariff costs financed by securitized utility tariff bonds and the final securitized utility tariff costs incurred by Evergy West, those difference would necessarily be addressed in the context of the future rate case, and could not be relied on to "affect the amount of securitized utility tariff bonds or the securitized associated utility tariff charges paid by customers." Section 393.1700.2(3)(c)k.

19

In its third point on appeal, OPC argues that it was unreasonable for the PSC to use a long-term debt rate instead of a short-term debt rate to calculate carrying costs included in qualified extraordinary costs[11] because the PSC's finding that carrying costs should be calculated using a long-term debt rate is in irreconcilable conflict with the PSC's finding that Evergy West carried costs incurred in connection with Winter Storm Uri on its books using a short-term debt rate.

The PSC's findings are not irreconcilable. The PSC's finding that Evergy West carried costs related to Winter Storm Uri on its books at a short-term debt rate is no more than an acknowledgment of an uncontested historical fact. The manner in which Evergy West reflected carrying costs on its books is not legally controlling with respect to the PSC's determination of how carrying costs should be calculated. In contrast, the Amended Report and Order found that the decision to employ a long-term debt rate to calculate carrying costs included in qualified extraordinary costs was explained: (i) by the fact that "[a]pplying Evergy West's long-term debt rate shares the cost of extraordinary events between ratepayers and shareholders"; (ii) by the fact that "[f]or accounting purposes, an obligation longer that 364 days is typically considered long-term[,] [such that] [u]sing Evergy West's long-term debt rate to determine carrying costs is more appropriate than using Evergy West's short-term debt rate, because more than a year has elapsed since Winter Storm Uri"; and (iii) by the fact that "Evergy West's [PSC]-

---

[11] The definition of "qualified extraordinary costs" in the Securitization Law permits the recovery of carrying costs for the extraordinary costs incurred in association with an anomalous weather event. *See* section 393.1700.1(13).

approved long-term debt rate is more appropriate to use than the [short-term debt rate] because this securitization addresses fuel and purchased power costs, not capital costs normally included in rate base, such as plant." These factual findings are not challenged by OPC on appeal, and are sufficient to demonstrate that the PSC's decision to use a long-term debt rate to calculate carrying costs included in qualified extraordinary costs is supported by substantial evidence on the record as a whole.

OPC has not sustained its burden to demonstrate that the PSC's use of a long-term debt rate to calculate carry costs included in qualified extraordinary costs was unreasonable.

Point three is denied.

**It Was Not Unreasonable for the PSC to Use the Same Discount Rate to Analyze Recovery Through Securitization as the Discount Rate Used to Analyze Recovery Through Customary Ratemaking (Point Four)**

In its fourth point on appeal, OPC argues that it was unreasonable for the PSC to use the same discount rate to analyze recovery through securitization as the discount rate used to analyze recovery through customary ratemaking. OPC contends that applying the same discount rate to analyze recovery through securitization and ratemaking is inconsistent with the PSC's finding that the discount rates should be different for securitization and customary ratemaking. OPC's point is without merit.

Section 393.1700.2(3)(c)b of the Securitization Law required the PSC's financing order to include:

> A finding that the proposed issuance of securitized utility tariff bonds and the imposition and collection of a securitized utility tariff charge are just and reasonable and in the public interest and ***are expected to provide***

21

> ***quantifiable net present value benefits to customers as compared to
> recovery of the components of securitized utility tariff costs that would
> have been incurred absent the issuance of securitized utility tariff bonds***.

(Emphasis added.)  Evergy West argued that a discount rate of 8.9 percent should be used

to determine the net present value of recovery of proposed securitized utility tariff costs

through both securitization and customary ratemaking.  Staff evaluated a range of

discount rates between 5.06 percent and 8.9 percent to evaluate the net present value of

recovery of proposed securitized utility tariff costs through both securitization and

customary ratemaking, but applied the same discount rate to each method of recovery in

doing so.  OPC argued that a lower discount rate should be applied to recovery through

securitization than through customary ratemaking.

The PSC ultimately found that a discount rate of 5.06 percent should be applied to

determine the net present value of recovery of proposed securitized utility tariff costs

through both securitization and customary ratemaking.  OPC does not claim that it was

error to use a discount rate of 5.06 percent to determine the net present value of recovery

through securitization, but argues it was error to use the same discount rate to determine

the net present value of recovery through customary ratemaking.  OPC argues that use of

the same discount rate cannot be reconciled with the PSC's finding that "[t]he certainty of

payments under securitization necessitates a lower discount rate than under other

ratemaking scenarios."

OPC's point on appeal is without merit for multiple reasons.  First, the resolution

of this point on appeal will have no practical effect on the Amended Report and Order.

As the PSC found in its Amended Report and Order, determining the discount rate that

"should be plugged into a formula to determine whether securitization would be a quantifiable [net present value] benefit to Evergy West's customers[] . . . does not have a direct impact on the amount that Evergy West should be allowed to recover through securitization." In other words, the calculation of qualified extraordinary costs that can be securitized is not impacted by the discount rates used to determine whether there is a quantifiable net present value benefit to Evergy West's customers to allow recovery of those costs through securitization as compared to customary ratemaking scenarios. Instead, the selection of discount rates is only relevant to the extent those rates impact the PSC's ability to confirm that securitization will result in a quantifiable net present value benefit to Evergy West's customers as required by section 393.1700.2(3)(c)b. Here, the Amended Report and Order found that "[a]t a securitization term of 15 years and a discount rate of 8.9 percent [the amount Evergy West proposed] and 5.06 percent [the amount Staff proposed], the implied [net present value] benefit of securitization would range from approximately $55 million to $67 million when compared to the FAC; and approximately $8 to $19 million when compared to deferral through an AAO." OPC does not challenge this finding. More importantly, OPC does not argue that the PSC's use of 5.06 percent as the discount rate for analyzing recovery through both securitization and customary ratemaking precluded the PSC from correctly finding that securitization will result in a quantifiable net present value benefit to Evergy West's customers. Thus, even if the PSC's decision to use the same discount rate was in conflict with the PSC's finding that the discount rate for calculating net present value of recovery through

23

securitization should be lower than recovery through customary ratemaking, that conflict would not result in actionable error.

Second, though the PSC did find in its Amended Report and Order that "[t]he certainty of payments under securitization necessitates a lower discount rate than under other ratemaking scenarios," it attributed this finding to OPC's expert witness who testified that a different discount rate should be used for calculating net present value for recovery through securitization and customary ratemaking.  As Staff points out in its brief, OPC's witness made this statement to "summarize his position that the [discount] rates used by Evergy [West's] witness . . . were too high," a position with which the PSC agreed.   [Staff's Brief, p. 25]  We agree with Staff that the purported inconsistent finding relied on by OPC in point four on appeal is taken out of context, and is not inconsistent with the PSC's findings about which discount rates should be used to determine net present value when viewed in light of the record as a whole.

OPC has not sustained its burden to establish that the PSC's use of the same discount rate to determine the net present value of recovery through securitization and customary ratemaking was unreasonable.

Point four is denied.

**Conclusion**

The PSC's Amended Report and Order is affirmed.

_____
Cynthia L. Martin, Judge

All concur